[No. 42000-3-I. Division One. August 17, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM B. GREENE, *Appellant*.

*David B. Koch* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*James H. Krider, Prosecuting Attorney*, and *Lisa D. Paul, Deputy*, for respondent.

*Sheryl G. McCloud*, amicus curiae.

ELLINGTON, J. — State mental health professionals diagnosed William Greene with Dissociative Identity Disorder (DID), formerly known as Multiple Personality Disorder (MPD), and treated him for almost three years before the events at issue in this case. At his trial on charges of indecent liberties and kidnapping, the court excluded evidence of the disorder and Mr. Greene's diagnosis under

the *Frye* test and ER 702. We reverse and remand for a new trial because DID is generally accepted in the scientific community and was relevant to Mr. Greene's defenses of insanity and diminished capacity.

## Dissociative Identity Disorder

Dissociative Identity Disorder reflects a failure to integrate various aspects of identity, memory, and consciousness. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 484 (4th ed. 1994) [hereinafter DSM-IV]. The DSM-IV provides diagnostic criteria for five dissociative disorders, including DID. The diagnostic criteria for DID are: .

A. The presence of two or more distinct identities or personality states (each with its own relatively enduring pattern of perceiving, relating to, and thinking about the environment and self).

B. At least two of these identities or personality states recurrently take control of the person's behavior.

C. Inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness.

D. The disturbance is not due to the direct physiological effects of a substance (e.g., blackouts or chaotic behavior during Alcohol Intoxication) or a general medical condition (e.g., complex partial seizures). **Note:** In children, the symptoms are not attributable to imaginary playmates or other fantasy play.

DSM-IV at 487. In general, an individual with DID will have a primary identity (sometimes referred to as the "host"), which bears the individual's given name and is usually passive, dependent, guilty, and depressed. *Id.* at 484. The alternate identities (or "alters") frequently have different names and contrasting characteristics. *Id.* The alters may vary from the host in a variety of ways, including reported age, gender, vocabulary, general knowledge, or

predominant affect. *Id.* Child and adolescent alters are the most commonly reported types of alternate identities.[1] Alters may exist on a co-conscious basis (i.e., aware of the host's and other alters' thoughts and feelings), a separate consciousness basis (i.e., little or no awareness of the thoughts and feelings of the host or other alters and vice versa), or a mixture of both.[2] For example, in the documented case of Jonah, the three alters each had intimate knowledge of the host, but the host had no awareness of the alters.[3] In addition, one of the alters (Sammy) could either coexist with the host or take complete control, and was fully aware of the existence of the other two alters.[4] The other two alters had only peripheral knowledge of each other or Sammy and would take complete control of behavior upon emergence.[5] Likewise, in the case of Sybil, one of the alters (Vicky) was co-conscious of the host and all of the other alters, but the host was amnesic toward all of the alternate identities.[6]

Particular identities may emerge in specific circumstances. DSM-IV at 484. For example, in Jonah's case, one alter would emerge when interpersonal difficulties arose, another alter would appear to deal with sexual problems, and a third alter would take control in situations of physi-

---

[1] Frank W. Putnam et al., *The Clinical Phenomenology of Multiple Personality Disorder: Review of 100 Recent Cases*, 47 J. CLINICAL PSYCHIATRY 285, 288, 292 (1986) [hereinafter Putnam et al.].

[2] George B. Greaves, *Multiple Personality 165 Years After Mary Reynolds*, 168 J. NERVOUS & MENTAL DISEASE 577, 581 (1980) [hereinafter Greaves].

[3] Arnold M. Ludwig et al., *The Objective Study of a Multiple Personality or, Are Four Heads Better Than One?*, 26 ARCHIVES GEN. PSYCHIATRY 298, 300 (1972) [hereinafter Ludwig et al.].

[4] *Id.*

[5] *Id.*; *compare* DSM-IV at 484 ("Alternate identities are experienced as taking control in sequence, one at the expense of the other, and may deny knowledge of one another, be critical of one another, or appear to be in open conflict.").

[6] Greaves, *supra* note 2, at 582; *see also* DSM-IV at 484 ("Individuals with this disorder experience frequent gaps in memory for personal history, both remote and recent. The amnesia is often asymmetrical. The more passive identities tend to have more constricted memories, whereas the more hostile, controlling, or 'protector' identities have more complete memories.").

cal danger.[7] An identity not in control of the person's behavior may gain access to consciousness by producing auditory or visual hallucinations (e.g., a voice giving instructions). DSM-IV at 484-85. A transition between identities is generally triggered by psychosocial stress. *Id.* at 485.

Research consistently links DID with childhood trauma, most commonly physical or sexual abuse or both.[8] Other forms of childhood trauma include neglect, abandonment, wartime experiences, witnessing the death of a parent or sibling, near death experiences, and painful medical procedures.[9] Individuals with DID frequently satisfy the criteria for Posttraumatic Stress Disorder (PTSD), the characteristic symptoms of which are persistent reexperiencing of a traumatic event, persistent avoidance of stimuli associated with the trauma, and persistent symptoms of increased arousal (e.g., difficulty sleeping or concentrating, hypervigilance, exaggerated startle response).[10]

Sigmund Freud posited that the ability of the ego to split is one of its normal functions.[11] Modern research appears to confirm that dissociation occurs to some degree in normal individuals, and that a continuum exists between the minor dissociations of everyday life (e.g., daydreaming, "getting lost" in a book or movie, highway hypnosis) and the major or pathological forms of dissociation (e.g., DID).[12] Although dispute exists concerning the etiology of DID, the

---

[7]Ludwig et al., *supra* note 3, at 300, 308.

[8]David H. Gleaves, *The Sociocognitive Model of Dissociative Identity Disorder: A Reexamination of the Evidence*, 120 Psychol. Bull. 42, 52 (1996) [hereinafter Gleaves]; Colin A. Ross et al., *Abuse Histories in 102 Cases of Multiple Personality Disorder*, 36 Can. J. Psychiatry 97, 100 (1991); *see* DSM-IV at 485.

[9]Gleaves, *supra* note 8, at 52.

[10]*Id.* (citing two studies in which 81 percent and 79 percent, respectively, of patients with DID were also diagnosed with PTSD); DSM-IV at 424-29 (diagnostic criteria for PTSD).

[11]Greaves, *supra* note 2, at 583.

[12]Eve M. Bernstein & Frank W. Putnam, *Development, Reliability, and Validity of a Dissociation Scale*, 174 J. Nervous & Mental Disease 727, 728 (1986) [hereinafter Bernstein & Putnam].

most accepted explanation is that childhood trauma disrupts ego formation in such manner as to advance the individual toward the pathological end of the dissociation continuum.[13] As further explained by Dr. Greaves:

> One needs to also bear in mind what, exactly, it is that dissociation accomplishes. Sybil did not escape torture through dissociation; she did not alter her insane environment. Instead, she was able to find lifesaving retreat in an altered phenomenal state, in much the way that a hypnotized person is able - not to escape pain - but to dissociate from the experience of pain. The inability to dissociate under such circumstances might very well lead to death by cardiac arrest.[14]

Dissociative Identity Disorder is diagnosed three to nine times more frequently in adult females than in adult males. DSM-IV at 485-86. Data concerning the diagnosis frequency ratio between female and male children is limited. *Id.* at 486. Possible explanations for the lower incidence of DID diagnosis among men include: (i) male children are not abused as frequently as female children; (ii) adult males do not seek treatment as often as adult females; and (iii) adult males with DID are incarcerated more frequently and are therefore less likely than adult females with DID to be diagnosed or participate in studies.[15] Women tend to manifest more identities than men, averaging 15 or more, whereas men average roughly eight identities. DSM-IV at 486. Individuals with DID spend an average of six to seven years in the mental health care system and receive at least

---

[13]*See* Colin A. Ross, *Twelve Cognitive Errors About Multiple Personality Disorder,* 44 AM. J. PSYCHOTHERAPY 348, 354 (1990) [hereinafter Ross] (DID arises from "the normal though self-destructive response of the human organism to extreme environmental insult."); Gleaves, *supra* note 8, at 42 ("According to [the post-traumatic] model, the dissociative response . . . is a creative survival strategy that helped the individual cope with the overwhelming trauma."); Greaves, *supra* note 2, at 583 ("[A]lter selves . . . arise as dissociative defenses against trauma . . . followed by repression of the trauma."), 587-91 (discussing the ego formation process and identifying psychic or physical trauma and extreme ambivalence as factors contributing to the development of DID).

[14]Greaves, *supra* note 2, at 590.

[15]Colin A. Ross et al., *Multiple Personality Disorder: An Analysis of 236 Cases,* 34 CAN. J. PSYCHIATRY 413, 416 (1989).

one, and often multiple, incorrect diagnoses before being properly diagnosed with DID.[16]

Opponents of DID offer four interrelated criticisms: (i) the child abuse reported by DID patients is unsubstantiated; (ii) DID is an iatrogenic[17] artifact; (iii) clinicians cannot determine whether DID patients are malingering or faking the disorder; and (iv) the diagnostic criteria for DID are vague.[18] Each of the above criticisms is addressed further below in connection with the application of the *Frye* and ER 702 standards.

## Facts

### General History

During childhood, William Greene experienced severe physical, sexual, and emotional abuse. At the insistence of his mother, Mr. Greene became a ward of the State of California at the age of eight; he spent the following nine years in various juvenile facilities and foster homes. He continued to endure both physical and sexual abuse, including a gang rape at the age of 12 by three older boys. Sometime during this period, Mr. Greene developed a substance abuse problem; he reports having used a variety of drugs, including cocaine.

At the age of 17, Mr. Greene escaped from a juvenile facility and fled to Washington with another youth. He was

---

[16]Putnam et al., *supra* note 1, at 287 (among 100 patients, the mean number of incorrect diagnoses was 3.6, with depression, neurotic disorder, personality disorder, and schizophrenia being the most commonly reported previous diagnoses); *see also* DSM-IV at 486.

[17]*See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1119 (1976) (defining "iatrogenic" as "induced by a physician - used chiefly of ailments induced in a patient by autosuggestion based on a physician's words or actions during examination"). Critics of DID contend that the disorder is created by clinicians through hypnosis or other suggestion. *See* Gleaves, *supra* note 8, at 42 (summarizing the "sociocognitive" or iatrogenic model of DID, and concluding that the model is not supported by research).

[18]*See, e.g.*, August Piper Jr., *Multiple Personality Disorder and Criminal Responsibility: Critique of a Paper by Elyn Saks*, J. PSYCHIATRY & L., Spring 1994, at 7 [hereinafter Piper].

eventually arrested and convicted in 1972 of taking a motor vehicle. From that point forward, Mr. Greene spent most of his life in prison. He was convicted in 1975 of sodomy, in 1980 of attempted burglary, in 1984 of indecent liberties, and in 1988, again of indecent liberties. Following the last conviction, Mr. Greene participated in the Sex Offender Treatment Program at Twin Rivers Correction Center. While in the program, Mr. Greene was diagnosed with both Major Depression and Multiple Personality Disorder (or DID).

After Mr. Greene's diagnosis with DID, a total of 24 "alters," of both genders, different races, and varying ages, were identified. The alters relevant to this case are Sam, Auto (or Otto), and Tyrone. Sam was initially violent, but after addressing abuse issues in therapy, Sam "vowed to never cause physical harm to anyone again." Auto/Otto is a helper personality with a generally flat affect. Tyrone originally presented as an adult, black male who used "rough and assaultive" language. After Mr. Greene began addressing his childhood abuse issues, Tyrone started regressing in age.

Mr. Greene was released from Twin Rivers in November 1992. From then until April 1994, Mr. Greene voluntarily continued therapy by attending each week: one group session through the Sex Offender Treatment Program; at least one Cocaine Anonymous meeting; and two 90-minute individual sessions with M.S., the psychiatric mental health nurse who was Mr. Greene's primary therapist at Twin Rivers. In addition, during this period, Mr. Greene was gainfully employed, maintained a nonabusive, intimate relationship, and had a number of healthy friendships.

During the two months prior to April 1994, Mr. Greene's condition began deteriorating. Due to a fire at his employer's facility, Mr. Greene was scheduled to be laid off. M.S. considered Mr. Greene to be a suicide risk and she instructed him to call her on a daily basis. On April 29, 1994, alarmed by a telephone conversation with him earlier in the day, M.S. visited Mr. Greene at his home to evaluate if

hospitalization was required. While M.S. was at his apartment, Mr. Greene took the actions giving rise to the charges at issue, i.e., indecent liberties and first degree kidnapping.

*Frye/ER 702 Hearing*

Prior to trial, Mr. Greene entered a written plea of not guilty by reason of insanity. Mr. Greene alleged that, as a result of his DID, he was insane or had diminished capacity at the time of the crime. The State moved to suppress any evidence of DID as not meeting the standards of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and its progeny.

The trial court conducted a three-day hearing concerning the State's motion. Dr. Robert Barrington Olsen, a practicing psychiatrist and president of the Washington State Psychiatric Association, testified for the defense. Dr. Olsen testified that DID is a generally recognized mental disorder. Dr. Olsen further testified that he had not been asked to develop an opinion whether Mr. Greene was insane at the time of the crimes charged, and that he believed insanity was a legal concept, not a medical one.

Dr. Gregg J. Gagliardi, a forensic psychologist at Western State Hospital, testified for the State. Dr. Gagliardi testified that, in the course of his work, he has been asked to evaluate six individuals attempting to use DID in their criminal defense. Of those six individuals, Dr. Gagliardi opined that two "definitely had the condition." Dr. Gagliardi further testified that a poll conducted in the United States showed that 80 percent of the over 3,000 physicians and psychologists surveyed recognized DID as a mental disorder. On this point, Dr. Gagliardi did not dispute Dr. Olsen's testimony that the consensus rate for any portion of the DSM-IV is only about 85 percent. In addition, Dr. Gagliardi testified that he was among the 80 percent who believed in DID. Dr. Gagliardi explained, however, that opponents of DID have criticized the DSM-IV's diagnostic criteria and expressed concerns about potential malingering or faking of the disorder. Dr. Gagliardi thought more research was required to address the relationship between DID and insanity, but understood the paucity of such

research, stating that "sanity is, after all, a legal question."

In addition to the testimony of Drs. Olsen and Gagliardi, the trial court considered the DSM-IV and various articles provided by the parties before issuing its ruling. The trial court found that "[t]he diagnosis of MPD/DID is not generally accepted in the professional mental health community," and concluded that "MPD/DID has no relevance to the insanity defense that satisfies the *Frye* test" and "[t]estimony regarding MPD/DID would not be helpful to a finder of fact." The trial court therefore excluded the insanity defense and any testimony related thereto. On the State's motion, the trial court also excluded any evidence of DID in relation to the defense of diminished capacity.

*Trial Testimony*

At trial, M.S. was called by the State to testify. In recounting the events of April 29, 1994, M.S. stated that, when she arrived at Mr. Greene's apartment, he did not immediately answer the door. As she started to leave, Mr. Greene came out of his apartment and announced, "We are here." M.S. observed that Mr. Greene appeared disheveled and unshaven, which was uncommon for him. She also discovered that his apartment was uncharacteristically messy.

M.S. began inquiring about Mr. Greene's employment situation and attempting to assess his mental state. M.S. found Mr. Greene's behavior unusual in that his responses were labored and his speech was extremely slow. At one point, Mr. Greene began crying and complained of a severe headache. In response to questions about his financial status, Mr. Greene frantically searched through his wallet, showed M.S. three one-hundred dollar bills and declared, "That is all."

Noticing at that point a glazed look on Mr. Greene's face, M.S. asked him whether he was "high." After Mr. Greene acknowledged that he was, M.S. announced she was leaving. Mr. Greene then became extremely emotional. He pushed on M.S.'s shoulder and said, "No." She backed away

from him, grabbed her keys, and attempted to use the attached capstun. When she aimed the capstun at him, Mr. Greene grabbed M.S.'s hand, causing spray to discharge into her hand.

M.S. dropped the keys and capstun and started to retreat from Mr. Greene. She tripped over a telephone cord and started to fall backward. Mr. Greene grabbed M.S.'s shirt as she fell, and the shirt ripped open. As M.S. lay on the hallway floor, Mr. Greene knelt beside her and tried to pull off her bra. She pushed him away, scratched his face and chest, and instructed him "don't do this." Mr. Greene managed to pull down M.S.'s bra, removed his own shirt, and began intermittently sucking and jiggling M.S.'s right breast.

At some point, M.S. began to cry; she then brought her hands to her face and got the capstun spray in her eyes. Mr. Greene helped her to the bathroom and gently washed her hands and wiped her eyes. During this short period, Mr. Greene's demeanor changed, and M.S. took the opportunity to plead with him to stop this behavior. Mr. Greene replied, "I got to do this."

Mr. Greene then sat M.S. in a chair in the bathroom and became transfixed by her breasts. For the next two hours, Mr. Greene alternatively touched, jiggled, and sucked on M.S.'s breasts in a ritualistic manner. During this period, M.S. kept talking to him about the therapy work they had done and what she thought was happening to him. Mr. Greene was uncharacteristically unresponsive.

After each cycle of touching, jiggling, and sucking on M.S.'s breasts, Mr. Greene would go to the bathroom sink and inject something into his arm. Mr. Greene performed a total of six or seven of these cycles. Beginning with the third or fourth cycle, Mr. Greene pulled down his pants, crouched in front of M.S., and massaged the end of his penis while performing the ritual with M.S.'s breasts. Mr. Greene never achieved an erection, never touched the shaft of his penis, and did not ejaculate. Throughout the latter cycles, Mr. Greene exhibited a rocking motion, which M.S.

later testified was a soothing behavior indicative of mental distress. In her testimony, M.S. described Mr. Greene's overall affect during this period as that of a child.

At some point, M.S. had fallen off the chair and onto the bathroom floor. After the sixth or seventh cycle, Mr. Greene stopped rubbing his penis, put his head on M.S.'s shoulder, and pleaded with her to "be nice" to him. M.S. patted Mr. Greene's head and told him she wouldn't hurt him. Mr. Greene began sobbing.

Mr. Greene's affect then changed. He straightened up "like a man" and again injected himself. He started touching M.S. again, and then stopped, saying, "You can go." M.S. tried to stand up, but her legs had fallen asleep while she was lying on the floor. Mr. Greene rubbed her legs to stimulate circulation. M.S. then started to stand up, saw Mr. Greene's hands coming toward her, took a step backward, and knocked over a container of oil. Mr. Greene began cleaning up the oil, but then, his affect changed, and he was again staring at M.S.'s breasts. She shoved him and he fell back against the toilet. On cross-examination, M.S. opined that, by pushing Mr. Greene, she startled him out of his trance-like behavior.

Mr. Greene then repeated that M.S. could leave. He stood aside to let her exit, but she realized she was not wearing a shirt, and she began to cry. Mr. Greene gave her a clean sweat shirt, but as M.S. was searching for her keys, Mr. Greene changed his mind about letting her leave. He backed M.S. into the bedroom and tied her hands behind her back. Mr. Greene then made two telephone calls. When he finished talking, he pulled the cord out of the telephone and used it to tie M.S.'s feet to her hands. He also wrapped her in a sheet and put duct tape over her mouth; the tape, however, did not stick to M.S.'s lips because she held out her tongue while Mr. Greene was applying it.

Mr. Greene located M.S.'s keys and started to leave, but because M.S. was concerned about confidential patient files in her car, she begged Mr. Greene (through the duct tape) not to take the car. Mr. Greene returned to the bedroom,

removed the duct tape, put a sock in M.S.'s mouth, and applied a larger piece of tape. Mr. Greene then left the apartment, driving away in M.S.'s car. Within roughly 15 minutes, M.S. was able to free herself from the bindings. She discovered the telephones in the apartment were inoperable, so she went across the street to Providence Hospital, where she gave a statement to police. Mr. Greene was apprehended later that evening.

*Offer of Proof*

As an offer of proof concerning Mr. Greene's defenses, with the jury excused, M.S. testified that she believed at the time of the incident Bill (the host), Tyrone, Sam, and Auto/Otto were intermittently present,[19] and she opined that Tyrone had age regressed to four, or possibly three, at the time of the crime. She also testified that substantial amnesic barriers exist between Tyrone and the other alters. In a report M.S. prepared approximately two months after the incident, she speculated that Sam had been actively attempting to stop the "assault," but could not maintain control long enough to accomplish this objective due to the high level of drugs in Mr. Greene's system.

*Post-Trial*

Following trial, Mr. Greene was found guilty on both counts, and sentenced to life imprisonment without the possibility of parole as a "persistent offender" pursuant to RCW 9.94A.120(4). Mr. Greene petitioned for direct review by the Supreme Court pursuant to RAP 4.2(a)(4), and by Order dated January 7, 1998, the case was transferred to this Court. On motion, the Commissioner granted "nine

---

[19]Out of the presence of the jury, Everett police detective Jimmy Phillips confirmed that, during a conversation with Mr. Greene the morning after the incident, he was able to identify three specific alters: Tyrone, Sam, and Auto/ Otto. The trial court ruled that any testimony referring to the names of, or switching between, alters was prohibited. On subsequent cross-examination, Detective Phillips testified that he observed Mr. Greene's degree of lucidity, demeanor, and vocabulary change over the course of their discussion; Mr. Greene would alternatively speak in street slang, in a mechanical mode, or in a weak and fearful manner.

concerned law professors" permission to file a brief as amici curiae.

## Standards of Admissibility for Expert Testimony

 To determine whether expert testimony concerning novel scientific evidence is admissible, Washington courts use a two-part inquiry: (i) does the proposed testimony satisfy the standard enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); and (ii) does the proposed testimony satisfy the standards of ER 702. *State v. Janes*, 121 Wn.2d 220, 232, 850 P.2d 495, 22 A.L.R.5TH 921 (1993). Under *Frye*, evidence derived from a scientific theory is admissible only if the theory has achieved general acceptance in the relevant scientific community.[20] *Id.* (quoting *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984)). A trial court's decision under the *Frye* standard is reviewed de novo. *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993). In considering whether the scientific theory at issue has achieved general acceptance, appellate courts undertake a searching review that need not be confined to the record and may involve consideration of the available scientific literature, secondary legal authority, and cases of other jurisdictions. *Id.* at 887-88; *see also State v. Copeland*, 130 Wn.2d 244, 255-56, 922 P.2d 1304 (1996) (materials unavailable until after a *Frye* hearing may also be considered). If a particular scientific theory or technique is sufficiently accepted within the relevant scientific community, any concerns regarding the possibility of error or mistake in the case at hand are issues to be addressed under ER 702 or by the trier of fact. *Cauthron*, 120 Wn.2d at 889, 890.

 ER 702 provides:

---

[20]The Washington Supreme Court has explicitly rejected the alternative test announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). *State v. Copeland*, 130 Wn.2d 244, 259-61, 922 P.2d 1304 (1996). The State nonetheless devoted a substantial portion of its direct examination of Dr. Gagliardi toward application of the *Daubert* test. This testimony does not appear relevant except to the extent it addresses the level of acceptance of DID.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 702 thus requires two inquiries: (i) does the proffered witness qualify as an expert; and (ii) would the proposed testimony be helpful to the trier of fact. *Janes*, 121 Wn.2d at 235-36. A trial court's decision under ER 702 will not be disturbed on appeal unless an abuse of discretion is shown. *Cauthron*, 120 Wn.2d at 890.

### Application of *Frye* Standard

The trial court concluded that DID does not satisfy the *Frye* standard because scientific research does not address whether an individual with DID is "insane" and has not provided a sufficiently reliable means of distinguishing between authentic and false manifestations of DID. In so concluding, the trial court inappropriately merged the *Frye* analysis with the ER 702 inquiry.

Under *Frye*, the question is whether DID is a generally accepted mental disorder. In contrast, the relationship between DID and insanity or diminished capacity is a legal issue more appropriately analyzed under ER 702. *See Janes*, 121 Wn.2d at 233-36 (separating the issue whether the battered child syndrome satisfies the *Frye* requirement of "general acceptance" from the question, under ER 702, whether evidence concerning the battered child syndrome would help the trier of fact evaluate if the defendant, allegedly suffering from the syndrome, reasonably perceived an imminent danger of serious bodily injury and thereby met the legal definition of self-defense). In addition, concerns regarding potential misdiagnosis or faking of DID should be addressed under ER 702. *Cauthron*, 120 Wn.2d at 890.

The trial court's and the State's insistence that the research concerning DID address whether individuals with the disorder meet the legal definition of insanity before

deeming it admissible ignores the distinction between law and medicine. The fundamental role of the mental health professional is to diagnose and treat mental disorders, not to assess criminal responsibility. *See* RCW 18.71.011 (defining the practice of medicine); RCW 18.83.010(1) (defining the practice of psychology); *State v. White*, 60 Wn.2d 551, 585, 374 P.2d 942 (1962) ("standard of criminal responsibility is a legal rather than a medical or scientific problem"), *cert. denied*, 375 U.S. 883, 84 S. Ct. 154, 11 L. Ed. 2d 113 (1963); *see also* DSM-IV at xxvii ("The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility . . . .").

Here, the State's own witness acknowledged that mental health researchers have little or no reason to study the relationship between DID and insanity:

> I don't know that anybody's done a study that investigates . . . in an empirical or scientific way how a disorder like DID affects sanity. And there's a good reason for that, because sanity is, after all, a legal question . . . . It's like mixing apples and oranges. They're two very different sets of concepts and ideas.

Thus, whether the scientific community has reached consensus regarding the relationship between DID and insanity is not a relevant question for purposes of the *Frye* analysis. *Cf.* FED. R. EVID. 704(b) ("No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.").

■ With regard to the appropriate inquiry under *Frye*, the trial court's finding that DID is not a generally accepted mental disorder is contrary to the evidence. The DSM-IV identifies DID as a mental disorder and outlines

the diagnostic criteria for the illness. DSM-IV at 484-87. The DSM-IV's diagnostic criteria and classification of mental disorders "reflect a *consensus* of current formulations of evolving knowledge" in the mental health field. DSM-IV at xxvii (emphasis added). The DSM-IV, like its predecessor, the DSM-III-R,[21] provides guidance to the courts in determining the acceptance of a psychiatric diagnosis. *In re Young*, 122 Wn.2d 1, 28 n.4, 857 P.2d 989 (1993).

The State's expert, Dr. Gagliardi, testified that one survey estimated that DID has an 80 percent acceptance rate among psychiatrists and psychologists. According to the undisputed testimony of Dr. Olsen, this level of agreement is consistent with the acceptance rate for most disorders described in the DSM-IV. Dr. Gagliardi never took the position that DID was not generally accepted; he merely testified about the criticisms expressed by a minority of mental health professionals. *Cf.* Ross, *supra* note 13, at 348 ("[T]here is no published work [as of 1990] that systematically argues that MPD is not a legitimate diagnosis.").

Among the criticisms mentioned by Dr. Gagliardi was the argument, adopted by the trial court, that changes from the DSM-III-R to the DSM-IV indicate a lack of consensus regarding DID. We find this reasoning inappropriate and circular. It seeks to measure whether a new theory has achieved general acceptance by comparing it with a previous version of the theory and rejecting it in the event any changes have occurred. Such reasoning not only discourages, it effectively prohibits, courtroom discourse concerning advances in science.

As alluded to earlier, skeptics of DID also express doubt whether DID is related to childhood trauma. For example, Dr. Piper complains that proponents of DID accept uncritically the allegations of child abuse made by DID patients. Piper, *supra* note 18, at 11. Dr. Piper implies that, because such childhood trauma is unsubstantiated and because child abuse is also reported by patients with other mental

---

[21]AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (3d rev. ed. 1987).

disorders, such as borderline personality disorder, a post-traumatic etiology of DID cannot be demonstrated. *Id.* at 9-10.

■ These challenges appear to be baseless. As Dr. Gleaves indicates, in two studies attempting to corroborate abuse histories, abuse was confirmed in 85 and 95 percent of the cases, respectively. Gleaves, *supra* note 8, at 54. In addition, Dr. Gleaves indicates that the scientific literature does not report a single case in which the alleged abuse in a patient with DID was found to be totally fabricated. *Id.* Dr. Gleaves's article was published in 1996, two years after Dr. Piper's. Moreover, to the extent patients with other disorders also recount incidents of childhood abuse, such reports do not necessarily disprove a connection between DID and trauma, but rather might merely indicate different responses to similar stimuli. In any event, however, we need not resolve the scientific debate concerning the etiology of DID; that DID is a generally accepted mental disorder, regardless of its cause, is sufficient for purposes of *Frye. See Cauthron*, 120 Wn.2d at 887 ("Because judges do not have the expertise required to decide whether a challenged scientific theory is correct, we defer this judgment to scientists. This inquiry turns on the level of recognition accorded to the scientific principle involved . . . .").

The State's proposition to the contrary, i.e., that DID is inadmissible per se, simply goes too far. The State's per se rule would exclude evidence of DID not only in cases in which an individual seeks to escape criminal responsibility, but also in cases in which introduction of the evidence might serve to protect either an individual with DID or others. *See, e.g., Vo v. Pham*, 81 Wn. App. 781, 916 P.2d 462 (1996) (in an action to quiet title, remanding for a determination whether a guardian ad litem should be appointed for defendant who apparently suffered from DID); *Wall v. Fairview Hosp. & Healthcare Serv.*, 568 N.W.2d 194 (Minn. Ct. App. 1997) (concluding that individuals with DID were "vulnerable adults" for purposes of statute requiring professionals to report abuse or neglect of such persons),

*review granted* (Oct. 21, 1997); *In re Jarred R.*, 236 A.D.2d 888, 654 N.Y.S.2d 64 (1997) (terminating parental rights of woman diagnosed with DID and borderline personality disorder because her condition rendered her incapable of caring for her children); *compare* RCW 71.05.020(8) (for purposes of involuntary civil commitment based on grave disability, query whether DID would satisfy the requirement of a mental disorder in the event the State's per se rule of exclusion were adopted). In light of the scientific evidence and the ramifications of the State's antipodal position, we hold, as a matter of law, that DID meets the *Frye* standard, but leave to the discretion of a trial court under ER 702 whether expert testimony concerning DID is admissible in a particular case.

## Application of ER 702

The qualifications of Drs. Olsen and Gagliardi were not challenged below and are not at issue on appeal. Thus, our review with regard to ER 702 is limited to assessing whether the trial court abused its discretion in concluding that evidence of DID would not assist the jury. In addressing this issue, two questions must be considered: (i) whether (and how) the symptoms of DID are relevant to the legal concepts of insanity and diminished capacity; and (ii) whether concerns over iatrogenic formation of DID, malingering or faking the disorder, and potential misdiagnosis of DID render evidence of DID unhelpful to the trier of fact.

## Relevance Inquiry Under ER 702

Washington courts have so far declined to resolve the first issue stated above because the respective parties did not develop an adequate record for review. *State v. Wheaton*, 121 Wn.2d 347, 365, 850 P.2d 507 (1993); *State v. Jones*, 82 Wn. App. 871, 876, 920 P.2d 225 (1996), *review denied*, 131

Wn.2d 1014, 932 P.2d 1257 (1997). Other jurisdictions and commentators resolve the issue in a variety of ways: (i) the whole-body method, in which DID is essentially ignored;[22] (ii) a rebuttable presumption of insanity for individuals with DID;[23] (iii) the "global" approach, which examines whether all of the identities were, or at least the host was, aware of the nature and wrongfulness of the conduct;[24] and (iv) the alter test, which asks whether the identity emergent at the time of the crime possessed sufficient mental capacity.[25]

 A number of these authorities are unpersuasive

[22]Sarah K. Fields, *Multiple Personality Disorder and the Legal System*, 46 WASH. U.J. URB. & CONTEMP. L. 261, 288-89 (1994) ("When a Multiple is the perpetrator of a crime, the law should treat the body as a whole. . . . [F]or Multiple defendants, the plea of not guilty by reason of insanity should not be available if the basis of insanity is MPD."); *compare Kirkland v. State*, 166 Ga. App. 478, 480, 304 S.E.2d 561, 564 (1983) ("[W]e will not begin to parcel criminal accountability out among the various inhabitants of the mind."); *State v. Grimsley*, 3 Ohio App. 3d 265, 268, 444 N.E.2d 1071, 1075-76, 27 A.L.R.4TH 1060 (1982) ("There was only one person driving the car and only one person accused of drunken driving.").

[23]Elyn R. Saks, *Multiple Personality Disorder and Criminal Responsibility*, 25 U.C. DAVIS L. REV. 383, 459 (1992) ("[W]e should adopt a rebuttable presumption that multiples are not responsible for their crimes."). Professor Saks identifies three cases in which the presumption of nonresponsibility might be rebutted: (i) all alters know about and acquiesce in the crime; (ii) limited emergence of innocent alters during trial; and (iii) a "ringleader" alter and participatory alters who act as a group. *Id.* at 453-54.

[24]*United States v. Denny-Shaffer*, 2 F.3d 999, 1008, 1013 (10th Cir. 1993) ("[D]efendant had shown by clear and convincing evidence that, as a result of a severe mental disease or defect, she was not guilty by reason of insanity since her dominant or host personality was neither aware of nor in control of the commission of the offense and thus was unable to appreciate the nature and quality or wrongfulness of the conduct which the alter or alters carried out."); *compare State v. Rodrigues*, 67 Haw. 70, 73, 679 P.2d 615 ("Since each personality may or may not be criminally responsible for its acts, each one must be examined under the . . . competency test."), *appeal dismissed, cert. denied*, 469 U.S. 1078, 105 S. Ct. 580, 83 L. Ed. 2d 691 (1984).

[25]*See Commonwealth v. Roman*, 414 Mass. 235, 239-40, 606 N.E.2d 1333, 1336 (1993) (rejecting defendant's argument that the capacity of the host rather than the alter emergent at the time of the crime should be considered, stating the "general rule" requires jurors "to consider the mental state of the individual at the time of the commission of the crime"); *compare Rodrigues*, 67 Haw. at 72-73, 679 P.2d at 618 ("The trend . . . is toward examining the sanity of each personality presented in an individual, or at least the personality which allegedly committed the offense.").

because either the analysis is superficial[26] or the burdens of proof[27] or standards of criminal responsibility[28] differ from those in Washington. In addition, the bulk of these authorities offer an unsatisfying result because they attempt to impose a per se rule when the evidence (and common sense) indicates that DID manifests itself somewhat differently in each individual and each situation. Thus, we resist the State's, the defense's, and amici's invitation to adopt one of the methods described above and instead implement a case-by-case approach, which examines whether the symptoms of DID manifested by an individual in a particular situation have relevance with regard to the defenses asserted.

### Insanity

In Washington, insanity is statutorily defined as follows:

> At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such extent that:
>
> (a) He was unable to perceive the nature and quality of the act with which he is charged; or
>
> (b) He was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010(1). The defendant bears the burden of proving insanity by a preponderance of the evidence.[29] RCW 9A.12.010(2). In Washington, because the Legislature at-

---

[26]*See Wheaton*, 121 Wn.2d at 357-59 (criticizing the reasoning of *Kirkland, Rodrigues*, and *Grimsley*); *accord Denny-Shaffer*, 2 F.3d at 1017-18 (also finding *Roman* unpersuasive).

[27]*E.g., Rodrigues*, 67 Haw. at 72, 679 P.2d at 617 ("[T]he State has the burden of proving a defendant's sanity beyond a reasonable doubt."); *compare* RCW 9A.12.010(2) (discussed *infra*).

[28]*E.g., Kirkland*, 166 Ga. App. at 482, 304 S.E.2d at 565 (Georgia statute permits finding of "guilty but mentally ill"); *see also Denny-Shaffer*, 2 F.3d at 1014-15 (because "penal statutes are to be strictly construed against the government," court applied liberal construction to federal statute defining insanity defense); *compare White*, 60 Wn.2d at 590 (discussed *infra*).

[29]A defendant acquitted of a felony by reason of insanity and found to be a substantial danger shall be hospitalized or confined in a less restrictive setting for

tempted to abolish the insanity defense, the defense is narrowly construed and given only its constitutionally required meaning. *State v. White*, 60 Wn.2d 551, 590, 374 P.2d 942 (1962), *cert. denied*, 375 U.S. 883, 84 S. Ct. 154, 11 L. Ed. 2d 113 (1963). Thus, unlike a number of other states, Washington does not recognize lack of volitional control or "irresistible impulse" as an element of the insanity defense. *Id.* at 579-80, 589-93. Substantial evidence of insanity must be presented before a jury instruction on the defense is warranted. *State v. Wicks*, 98 Wn.2d 620, 622, 657 P.2d 781 (1983).

Applying the insanity standard to the facts of this case, evidence of DID appears relevant, at least with regard to the indecent liberties charge. The evidence at trial, combined with the offer of proof, indicates that, at the time of the conduct giving rise to the indecent liberties charge, Tyrone was the emergent identity, and the host and other alters were not co-conscious with Tyrone. According to M.S., Mr. Greene's overall affect while touching her was that of a child, and she estimated that Tyrone had the mental state at most of a four-year-old boy.

M.S.'s observations are relevant to the insanity defense because they tend to show that, at the time of the indecent liberties, Mr. Greene was incapable of perceiving the nature of his actions or distinguishing between right and wrong. Arguably, his host and adult alters were unconscious, and his emergent alter had the mental capacity of a young child. Mr. Greene should therefore have been permitted to present this testimony to the jury. *See* ER 402 ("All relevant evidence is admissible . . . ."). Without the aid of expert testimony, however, the jury would have likely been unable to reach an informed decision concerning the extent to which DID affected Mr. Greene's sanity. *Compare Janes*,

---

a period not to exceed the maximum possible penal sentence for the offense charged. RCW 10.77.020(3); RCW 10.77.110(1); *see* RCW 10.77.040 (special verdict form). A criminally committed person may petition for conditional release or final discharge. RCW 10.77.150; RCW 10.77.200. On hearing of a petition for final discharge, the committed person bears the burden of proof by a preponderance of the evidence that he or she no longer presents a substantial danger to others or likelihood to recidivate. RCW 10.77.200(2).

121 Wn.2d 220, 234-36, 850 P.2d 495, 22 A.L.R.5TH 921 (1993) (expert testimony was needed to inform the jury that abused children perceive danger more acutely than unabused children and might reasonably connect apparently innocuous behavior with a threat of serious bodily harm).

By way of contrast, M.S.'s opinion that the alter known as Sam was attempting to stop Tyrone but could not maintain presence long enough to do so does not tend to establish an insanity defense. As mentioned earlier, lack of volitional control does not demonstrate insanity in Washington. In addition, M.S.'s impression that Sam's inability to take or maintain control resulted from the drugs injected by Tyrone is also irrelevant for purposes of proving an insanity defense. *See* RCW 9A.16.090 ("No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition . . . ."). Lack of volitional control and voluntary intoxication might, however, have relevance to a diminished capacity defense.

Sam's desire to stop Tyrone suggests that he might have understood the nature and wrongfulness of Tyrone's behavior. If so, questions arise about the internal consistency of M.S.'s testimony. Was Sam co-conscious, but unable to maintain control, or was Sam, like the other identities, unconscious to such extent that we need only evaluate Tyrone's mental capacity?[30] A careful review of the chronology of events indicates that possibly both scenarios occurred, but in sequence.

During the two-hour period in which the acts of indecent

---

[30]An additional issue might arise on remand. The literature suggests that, through appropriate therapy, DID patients can acquire some ability to control shifts between alters. *See* Philip M. Coons, *Treatment Progress in 20 Patients with Multiple Personality Disorder,* 174 J. NERVOUS & MENTAL DISEASE 715, 718-19 (1986) (defining the therapeutic goal of integration and discussing the improvements typically observed during the middle phase of therapy). The record does not reflect the extent to which Mr. Greene was able at the time in question to control switching between alters while not in an intoxicated state. On remand, if the evidence shows that voluntary intoxication impaired his then-existing capacity to transition between alters, the trial court has discretion to limit the insanity defense and/or provide an appropriate instruction to the jury.

liberties transpired, Mr. Greene was completely nonresponsive and did not manifest any signs of transition or attempted transition from one alter to another. Arguably, during this period, Tyrone was emergent and the other identities were unconscious. At the end of this two-hour period, Mr. Greene appealed to M.S. to "be nice" to him and began sobbing. Following the sobbing, M.S. observed the first indication of transition between alters. Mr. Greene's affect changed and he reportedly straightened up "like a man." Here, arguably, begins the tug-of-war between Sam and Tyrone. At this point as well, though, the acts of indecent liberties for the most part ceased. Thus, a jury could reasonably conclude that Mr. Greene was insane during the period relating to the indecent liberties charge, but reach a different result for the subsequent time.

As to this subsequent time, when Sam was arguably coconscious and struggling for control, and Mr. Greene took actions relating to the kidnapping charge,[31] the offer of proof does not support an insanity defense. During this second phase, Mr. Greene made two attempts to release M.S., but eventually tied and gagged her before leaving the apartment. He also made two telephone calls, indicating that he was lucid and coherent. Thus, the testimony offers no indication that, as a result of DID, Mr. Greene was unable to perceive the nature and wrongfulness of his acts of tying and gagging M.S. As discussed below, however, the evidence might demonstrate a diminished capacity negating the intent element of first degree kidnapping.

### Diminished Capacity

Washington courts recognize the defense of diminished capacity. *E.g.*, *State v. Ferrick*, 81 Wn.2d 942, 506 P.2d 860, *cert. denied sub nom. Gustav v. Washington*, 414 U.S. 1094, 94 S. Ct. 726, 38 L. Ed. 2d 552 (1973); *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310, *review denied*, 95

---

[31]Although Mr. Greene's actions during the first phase of events also give rise to a kidnapping charge, if Mr. Greene were to establish insanity for that period, the defense would apply not only to the indecent liberties charge, but also to the earlier acts of kidnapping.

Wn.2d 1019 (1981); *State v. Martin*, 14 Wn. App. 74, 538 P.2d 873 (1975), *review denied*, 86 Wn.2d 1009 (1976). When a specific intent or knowledge is an element of the crime charged, a defendant is entitled to present evidence showing an inability to form that intent or knowledge at the time of the crime. *Edmon*, 28 Wn. App. at 102-04; *Martin*, 14 Wn. App. at 75. Acceptable bases for arguing a lack of capacity include voluntary intoxication, RCW 9A.16.090, and mental disorder, *Ferrick*, 81 Wn.2d at 944, but not emotion (e.g., jealousy, fear, anger, hatred, etc.), *Edmon*, 28 Wn. App. at 103. The State bears the burden of proving beyond a reasonable doubt that the defendant had the requisite mental state for the crime charged. *State v. James*, 47 Wn. App. 605, 609, 736 P.2d 700 (1987).

In *Edmon*, this Court outlined nine prerequisites that must be satisfied before an expert may testify in opinion form concerning a defendant's ability to form the mens rea for an offense. These factors overlap to some extent with the *Frye* and ER 702 requirements, but also include specific standards of proof. For example, the expert's testimony must be based on substantial supporting evidence in the record and not entirely on uncertain estimates or speculation. *Edmon*, 28 Wn. App. at 102-03. In addition, the expert cannot infer the lack of capacity from the existence of a mental disorder, but rather must explain how the disorder had such effect. *Id.* at 103. Finally, the expert must be able to testify to an opinion with reasonable medical certainty based on a personal examination of the defendant. *Id.* at 102.

Here, the State contends that Mr. Greene failed to make an adequate offer of proof with regard to a diminished capacity defense. We disagree. In response to the State's motion in limine to exclude any mention of DID, defense counsel represented that Dr. Olsen was prepared to testify and that his testimony would satisfy the *Edmon* factors. Given that the trial court's decision to prohibit any testimony concerning DID was based on its *Frye* analysis, and not on the *Edmon* factors, we believe defense counsel sufficiently preserved the issue for appeal.

Both of the crimes charged against Mr. Greene involve either a specific intent or knowledge. *See* RCW 9A.44.100(1)(a) ("A person is guilty of indecent liberties when he knowingly causes another person who is not his spouse to have sexual contact with him or another . . . [b]y forcible compulsion[.]''); RCW 9A.40.020(1)(b) ("A person is guilty of kidnapping in the first degree if he intentionally abducts another person with intent . . . to facilitate commission of any felony or flight thereafter[.]"). The evidence that, as a result of DID, Mr. Greene was either in a child-like state or struggling to cease the criminal behavior was relevant to the issue whether Mr. Greene had the capacity at the time of the crime to form the required mens rea. Mr. Greene should have had an opportunity to present this evidence to the jurors,[32] along with expert testimony to assist them, assuming such testimony satisfied the *Edmon* factors.[33] To hold otherwise would be manifestly unfair in light of the legislative pronouncement that even voluntary intoxication may be considered in assessing the defendant's mental state at the time of the crime. *Compare State v. Moore*, 113 N.J. 239, 286-89, 550 A.2d 117, 140-41 (1988) (reversing murder conviction of defendant with DID due to trial court's failure to instruct on diminished capacity).

### Reliability Inquiry Under ER 702

Having concluded that, in this case, evidence of DID bears relevance to the insanity defense (as to one charge)

---

[32]Here, the trial court's decision to exclude any mention of DID severely limited the victim's testimony, a fact about which she complained during direct examination by the State: "I feel like I am not being able to say an awful lot of things that need to be said." The effect of the trial court's ruling was to conceal from the jury testimony that was particularly relevant to the defendant's mental state at the time of the crime. *See Lee v. Thompson*, 452 F. Supp. 165, 169 (E.D. Tenn. 1977) ("[T]he words and acts of a defendant immediately before, during, and after the offense are the best evidence of his state of mind at the time of the acts charged."), *aff'd*, 577 F.2d 741 (6th Cir. 1978).

[33]*State v. Stumpf*, 64 Wn. App. 522, 526, 827 P.2d 294 (1992) ("[W]hen a diminished capacity defense is asserted in a criminal action, expert testimony is required to establish the existence of the alleged mental disorder, as well as the requisite causal connection between the disorder and the diminished capacity.").

and the diminished capacity defense (as to both charges), the question remains whether concerns over iatrogenic formation, malingering, and misdiagnosis of the disorder render expert testimony regarding DID unreliable and therefore unhelpful to the jury. These concerns are case specific—critics of DID do not appear to contend that *every* case of DID is iatrogenic, faked, or misdiagnosed. *Cf.* Gleaves, *supra* note 8, at 42 ("[N]o disorder can be entirely iatrogenic or entirely noniatrogenic."). Thus, the problem presented is distinguishing between an "authentic" case of DID and a fraudulent one.

In this regard, one area of debate concerning DID is whether the disorder can be or is iatrogenically induced through hypnosis or other suggestion. Critics of DID observe that individuals with DID are generally more susceptible to hypnosis and that alters are usually "discovered" during therapy. *See* Piper, *supra* note 18, at 25-27. In light of these observations, critics suggest that DID might be the result of ideas regarding multiplicity planted in the minds of patients by clinicians using hypnosis or some other means of suggestion. *Id.* Proponents of DID respond that, although certain laboratory studies have demonstrated that phenomena superficially similar to DID can be elicited in control subjects through hypnosis, none of the studies supports an inference that DID can be iatrogenically created because the participants in those studies did not manifest any of the established features of DID, e.g., episodes of time loss, hearing voices, etc. Gleaves, *supra* note 8, at 47. In addition, in two studies on the subject, only a small percentage (27 and 4 percent, respectively) of the DID patients had been hypnotized before being diagnosed. *Id.* at 46 (discussing studies by Ross, Norton, and Wozney (1989) (n=214) and Coons, Bowman, and Milstein (1988) (n=50)).

While the etiology of DID (posttraumatic or iatrogenic)

might be germane to the choice of treatment methods,[34] and perhaps to medical ethics, it does not appear particularly relevant to the assessment of criminal responsibility. If the defendant was suffering from DID at the time of the crime, and the disorder affected the defendant's sanity or capacity to form the requisite mens rea, the genesis of the disorder is not of legal consequence. For purposes of the ER 702 inquiry, a court need only recognize the possibility that DID might be hypnotically induced and factor that prospect into the analysis in appropriate circumstances. For example, if a defendant did not previously manifest symptoms of DID, but during hypnosis in the course of examination by the defense's expert witness, alternate identities were "discovered," the court should consider the probability of faking by the defendant or improper suggestion by the expert, both of which would undermine an assessment that the defendant suffered from DID at the time of the crime.

Critics of DID appear to base their suspicion in part on the increased number of diagnosed cases over the past two decades.[35] This rise in reported cases fuels concerns that DID patients are malingering[36] or faking the disorder

---

[34]*Compare* Paul R. McHugh, *Resolved: Multiple Personality Disorder Is an Individually and Socially Created Artifact - Affirmative*, 34 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 957 (1995) (proposing that DID be treated as a form of hysteria that will disappear if therapists refuse to talk to alters or otherwise give credence to the disorder); *with* Gleaves, *supra* note 8, at 49 (treatment based on the iatrogenic (or hysteria) model does not cause dissociative symptoms to subside, rather "patients simply stop trusting their therapist" and learn that discussing their symptoms with their therapist is not "safe"); *and* Ross, *supra* note 13, at 352 (benign neglect of DID does not reduce dissociative symptoms, whereas proper diagnosis and treatment based on the posttraumatic model results in "stable integration" within an average of two to four years).

[35]*See* Gleaves, *supra* note 8, at 51 (offering five, noniatrogenic factors to explain the increase in reported cases: inclusion of MPD in the DSM-III (1980); increased awareness regarding child abuse; Vietnam war and subsequent interest in PTSD; developments in cognitive psychology; and reduced skepticism toward DID); *compare* 2 RP 83 (Dr. Olsen also suggests that, with the recent development of pharmaceutical treatments for many psychiatric disorders, clinicians are able to diagnose DID when medication prescribed for other disorders is ineffective).

[36]The DSM-IV defines "Malingering" as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external

either to draw attention to themselves[37] or to escape criminal responsibility. *See* Piper, *supra* note 18, at 22 (discussing the case of Kenneth Bianchi, in which seven psychiatrists and psychologists could not agree whether the defendant was malingering). Dr. Piper suggests that no means exists of reliably distinguishing between veridical and malingered cases of DID. *Id.* at 19-22. A related criticism is that the DSM's diagnostic criteria for DID are too vague. *Id.* at 11-19. The State contends that evidence of DID is therefore inadmissible per se.

 We reject the State's all-or-nothing approach. Concerns over malingering and misdiagnosis are not unique to DID or to criminal defenses, and we believe the State's proposition is likely to create more problems than it solves. Instead, we adopt a case-by-case method that examines certain indicia of reliability in assessing the admissibility of expert testimony concerning DID. In so holding, we observe that the scientific literature reveals at least five diagnostic tools for reliably measuring dissociative disorders:

 (i) Dissociative Disorders Interview Schedule (DDIS);[38]

 (ii) Dissociative Experiences Scale (DES);[39]

---

incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." DSM-IV at 683. Malingering differs from Factitious Disorder in that the motivation for symptom production in Malingering is external, whereas in Factitious Disorder, it is an intrapsychic need to maintain the sick role. *Id.*

[37]*But see* Gleaves, *supra* note 8, at 45-46 (in response to proposition that DID represents a highly effective means of gaining attention, summarizing studies indicating that patients with DID often receive especially hostile treatment and concluding that feigning a different disorder would probably be more rewarding).

[38]Colin A. Ross et al., *Structured Interview Data on 102 Cases of Multiple Personality Disorder From Four Centers*, 147 Am. J. Psychiatry 596, 600 (1990) ("The proposed DSM-IV criteria for the disorder . . . appear to yield very few, if any, false positive diagnoses in clinical subjects. One advantage of using the Dissociative Disorders Interview Schedule in clinical assessments is that a malingerer would have to be aware of the entire multiple personality disorder profile to produce a convincing picture of the disorder on that structured interview.").

[39]Bernstein & Putnam, *supra* note 12, at 731-32 ("[T]he DES has good split-half reliability and test-retest reliability. It is internally consistent and produces scores that are stable over time . . . . The DES is a reliable and valid instrument that is able to distinguish between subjects with a dissociative disorder and those

(iii) Millon Clinical Multiaxial Inventory-II (Millon-II);[40]

(iv) Questionnaire of Experiences of Dissociation (QED);[41] and

(v) Structured Clinical Interview for DSM-IV Dissociative Disorders (SCID-D).[42]

In addition, several independent studies have documented a "relatively clear set of clinical DID features"[43] that can

without."); Eve Bernstein Carlson et al., *Validity of the Dissociative Experiences Scale in Screening for Multiple Personality Disorder: A Multicenter Study*, 150 AM. J. PSYCHIATRY 1030, 1035-36 (1993) (The DES performs well as a screening tool for DID). *But see* Gilbertson et al., *Susceptibility of Common Self-Report Measures of Dissociation to Malingering*, 5 DISSOCIATION 216 (1992) [hereinafter Gilbertson et al.] (reporting that a study involving nursing students who were instructed to fake their answers indicated the DES and the QED are highly susceptible to malingering).

[40]Joan W. Ellason & Colin A. Ross, *Millon Clinical Multiaxial Inventory-II Follow-Up of Patients with Dissociative Identity Disorder*, 78 PSYCHOL. REP. 707, 715 (1996) ("The data to date support the conclusion that Dissociative Identity Disorder can be successfully treated and that the Millon-II can be used as a measure of outcome."). The Millon-II was used in this study to compare "integrated" and "nonintegrated" patients treated for DID. *Id.* at 708.

[41]Gleaves, *supra* note 8, at 46 (In one study, the QED was able to differentiate patients with DID from those with eating disorders and from controls with 90 percent and 92 percent accuracy, respectively. In another study, the QED discriminated between patients with DID and controls with 100 percent accuracy, based solely on a cutoff score.); Kevin C. Riley, *Brief Communication—Measurement of Dissociation*, 176 J. NERVOUS & MENTAL DISEASE 449 (1988) ("The QED demonstrates good reliability and validity and is offered as an alternate assessment technique for the study of dissociation."). *But see* Gilbertson et al., *supra* note 39.

[42]Gleaves, *supra* note 8, at 46 ("The state-of-the-art [as of 1996] assessment of dissociative disorders is through the use of structured interviews, such as the Structured Clinical Interview for DSM-IV Dissociative Disorders . . . . The SCID-D is consistent in format with other modules of the SCID and systematically guides the evaluator through the assessment of five domains of dissociative symptoms: amnesia, depersonalization, derealization, identity confusion, and identity alteration. Studies of the SCID-D have found it to lead to highly reliable diagnoses of DID."); Marlene Steinberg et al., *Distinguishing Between Multiple Personality Disorder (Dissociative Identity Disorder) and Schizophrenia Using the Structured Clinical Interview for DSM-IV Dissociative Disorders*, 182 J. NERVOUS & MENTAL DISEASE 495, 501 (1994) ("This study indicates that the SCID-D has the capacity to discriminate successfully between individuals with diagnoses of schizophrenia and schizoaffective disorder and those with diagnoses of MPD.").

[43]The clinical DID features include "dissociative symptoms such as amnesia (including ongoing amnesia and lack of autobiographical memory for childhood), chronic depersonalization and derealization, Schneiderian symptoms (hearing

be "measured by objective means." Gleaves, *supra* note 8, at 43.

Based on the foregoing review of the scientific literature, the following factors appear particularly pertinent in assessing whether a defendant is malingering or faking DID: (i) recent fabrication of the disorder; (ii) disagreement among mental health professionals who acknowledge the disorder;[44] (iii) borderline scores on two or more diagnostic tools; and (iv) no prior history of childhood abuse or trauma. This list of factors might not be exhaustive, and none of the factors alone appears dispositive. In conjunction, however, the factors would seem to indicate a high probability that the defendant is malingering or faking the disorder to escape criminal liability. In that event, evidence of DID would not assist the trier of fact and the trial court could exercise its discretion to exclude expert testimony on DID pursuant to ER 702. Otherwise, provided that DID satisfies the relevance analysis with respect to the defense at issue, the defendant should be allowed to present evidence of DID to the jury, with the State having an opportunity to offer contradictory testimony. This test thus balances an accused's right to present a defense against the State's interest in discouraging false assertions of mental incapacity.

Applying the factors to this case, Mr. Greene does not present an obvious example of malingering, and the case should be remanded for a new trial. Mr. Greene was diagnosed and treated *by the State* for DID over three years before the offense at issue. His scores on the DDIS, DES, and SCID-D are (according to M.S.) consistent with DID. In addition, Mr. Greene reported an abuse history before

---

voices and passive influence experiences), and identity alteration." Gleaves, *supra* note 8, at 43. Identity alteration includes "behaving like a different person," "disremembered behaviors, finding possessions for which one cannot account, hearing voices and carrying on internal or written dialogues between dissociated ego states, spontaneous age regressions to traumatic events, and referring to oneself as 'we.'" *Id.* at 43 n.2.

[44]An opinion of malingering by a mental health expert who does not believe in DID bears little weight in this analysis; such expert would likely conclude that everyone is malingering.

he had an incentive to malinger, and the record indicates some corroboration of that history. Finally, just prior to this offense, Mr. Greene manifested behaviors consistent with DID, e.g., referring to himself as "we,"[45] complaining of a severe headache,[46] and suffering from psychosocial stress.

## Conclusion

To summarize, DID is a generally recognized mental disorder and the trial court erred in concluding to the contrary. Although we hold as a matter of law that DID satisfies the *Frye* standard, we decline to adopt a per se rule with regard to the admissibility of expert testimony concerning the disorder. When faced with a challenge under ER 702, a trial court must first determine whether, given the facts of the case, the symptoms of DID are relevant to the particular defense or other legal concept at issue. In this context, "relevant" has the meaning ascribed in ER 401. Given the nature of the disorder, the trial court may, if appropriate, examine the relevance of DID with respect to different time periods or separate offenses. *Cf. Denny-Shaffer*, 2 F.3d at 1018-22 (distinguishing between the period of initial abduction and the subsequent continuing actions of kidnapping). In addition, the trial court may consider the state of mind of whichever alters the circumstances dictate, i.e., the emergent alter if no other alters are co-conscious, all co-conscious alters, or other appropri-

---

[45]*See supra* note 43.

[46]Several clinicians have reported that the precursor to transition between alters is a severe headache. Greaves, *supra* note 2, at 585. For example, Jonah initially sought psychiatric help for severe headaches after which he would later regain awareness but be unable to remember events during the intervening period. Ludwig et al., *supra* note 3, at 299. Likewise, Eve White (The Three Faces of Eve) originally sought treatment for severe and blinding headaches, and Sybil suffered from "headaches so bad that following such an attack, [she] had to go to sleep for several hours." Greaves, *supra* note 2, at 585; *see also* Coons et al., *Multiple Personality Disorder—A Clinical Investigation of 50 Cases*, 176 J. NERVOUS & MENTAL DISEASE 519, 524 (1988) ("The present study also found a high incidence of headaches in MPD . . . that occurred commonly either before or during the transition from one personality to another.").

ate combination. If the trial court determines that evidence of DID is relevant, the trial court may nevertheless exclude the evidence if the factors indicating a probability of malingering or faking are present.

We conclude, in this case, the disorder is relevant to the defense of insanity on the indecent liberties charge and to the defense of diminished capacity on both charges. In addition, we find that Mr. Greene does not exhibit signs of obvious malingering. We therefore remand for a new trial. On remand, Mr. Greene must satisfy the *Edmon* factors before he may introduce expert testimony that he lacked the capacity to form the requisite mental state for the crimes charged. Provided he does so, Mr. Greene should be provided an opportunity to present both defenses to a jury.

In light of our disposition, we need not reach the issue whether the trial court erred in admitting the testimony of, and letters written by Mr. Greene to, a prior victim. Likewise, we need not address Mr. Greene's pro se arguments concerning the constitutionality of the Persistent Offender Accountability Act.

Reversed and remanded for further proceedings consistent with this opinion.

AGID, A.C.J., and WEBSTER, J., concur.

Review granted at 137 Wn.2d 1013 (1999).