SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, SANDERS, and IRELAND, JJ., concur.

Reconsideration denied November 9, 1999.

[No. 67250-4.   En Banc.]
Argued May 27, 1999.     Decided September 30, 1999.
THE STATE OF WASHINGTON, *Petitioner,* v. WILLIAM B. GREENE, *Respondent.*

*James H. Krider, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for petitioner.

*William B. Greene*, pro se.

*Nielsen Broman & Associates, P.L.L.C.*, by *David B. Koch*, for respondent.

*Sheryl G. McCloud (Elyn Saks*, of counsel), on behalf of Nine Concerned Law Professors, amicus curiae.

Johnson, J. — The primary issue in this appeal is whether dissociative identity disorder (DID) is admissible under *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923) and Washington Rules of Evidence (ER) 702 to establish the defense of insanity or diminished capacity. In a pretrial hearing, the trial court concluded DID testimony was not admissible under *Frye* or ER 702. Following trial by jury, the defendant, William B. Greene (Greene), was convicted of indecent liberties and first degree kidnapping. On appeal, holding that DID is generally accepted in the scientific community and relevant to the defenses of insanity and diminished capacity, the Court of Appeals reversed and remanded for a new trial. *State v. Greene*, 92 Wn. App. 80, 960 P.2d 980 (1998). We accepted review and now affirm in part and reverse in part the decision of the Court of Appeals. We agree with the Court of Appeals that DID is generally accepted within the scientific community as a diagnosable psychiatric condition. Under the facts of this case, however, we find the trial court properly refused to admit the proffered expert testimony regarding the defend-

ant's dissociative condition because it would not have been helpful to the trier of fact as required under ER 702.

## FACTS

In 1988, Greene pleaded guilty to indecent liberties and was incarcerated at the Twin Rivers Correctional Center (Twin Rivers), where he was accepted into its sex offender treatment program (SOTP). While in the SOTP, Greene underwent psychiatric treatment with M.S., a psychotherapist and registered nurse specializing in psychiatric mental health care. Treatment included psychometric tests and hypnosis for the voices Greene complained of hearing in his head. Under hypnosis, Greene manifested 24 separate identities and several additional identity fragments, and was diagnosed with DID and major depression.

Greene was released from Twin Rivers in 1992, but voluntarily continued treatment through the SOTP, including individual sessions with M.S. In the months leading up to April 1994, Greene's condition, which had been stable, began deteriorating. On April 29, 1994, alarmed by a telephone conversation with Greene earlier in the day, M.S. arranged to visit Greene at his home. She wanted to assess if Greene required psychiatric observation in a hospital. M.S. often visited patients at their homes in her professional capacity. She had previously done so with Greene approximately 10 times without incident. On this occasion, however, Greene became aggressive, would not let M.S. leave his home, sexually assaulted her, left her bound and gagged in his home, and eventually drove off in her car. After M.S. freed herself, she contacted police and Greene was apprehended.

Greene was charged in Snohomish County Superior Court with indecent liberties and first degree kidnapping. Prior to trial, he pleaded not guilty by reason of insanity as a result of DID. Greene claimed that "Tyrone," one of his diagnosed alternate personalities, was the prime instigator of the incident with M.S. According to Greene, "Tyrone"

was manifesting as a "child, clearly less than seven years of age, and incapable of understanding the nature and quality of his acts or the fact that they were either right or wrong." Clerk's Papers at 200. Greene also claimed at least four other of his alternate personalities exchanged executive control of his body during the incident.

The trial court judge conducted a pretrial hearing on the admissibility of DID expert testimony to establish a defense of insanity. The court concluded the proffered DID testimony was not admissible to establish a defense of insanity. Subsequent to this determination, the State made a motion in limine to exclude any DID testimony that would be used to establish a defense of diminished capacity. The trial court granted the motion and excluded the testimony.

A jury convicted Greene on both counts. Greene petitioned this court for direct review under RAP 4.2(a)(4). We declined review and transferred the case to the Court of Appeals. The Court of Appeals reversed and remanded. *Greene*, 92 Wn. App. 80. The State sought and we granted review.

## DISSOCIATIVE IDENTITY DISORDER[1]

DID is more commonly known as multiple personality disorder. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV (4th ed. 1994) (hereinafter DSM-IV) recognizes five distinguishable dissociative disorders, of which DID is one. The DSM-IV provides the following diagnostic criteria for DID:

A. The presence of two or more distinct identities or personality states (each with its own relatively enduring pattern of perceiving, relating to, and thinking about the environment and self).

B. At least two of these identities or personality states recurrently take control of the person's behavior.

C. Inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness.

---

[1] We include this brief description for background purposes only.

D. The disturbance is not due to the direct physiological effects of a substance (e.g., blackouts or chaotic behavior during Alcohol Intoxication) or a general medical condition (e.g., complex partial seizures).

DSM-IV at 487.

An individual suffering from DID has a nonintegrative identity nebulously divided between the primary identity (host) and at least one alternative identity or identity fragment (the alter(s)). DSM-IV at 484. This lack of integration results in debilitating ruptures in the patient's personality, behavior, thought, and memory.

In Western studies, the etiology of DID is most commonly understood to be childhood traumatism (e.g., death of a parent/sibling, wartime trauma, etc.) which triggers the pathological onset of severely disrupted ego identification. Colin A. Ross, *Twelve Cognitive Errors About Multiple Personality Disorder*, 44 Am. J. Psychotherapy 348, 353-54 (1990).

DID functions as a pathologically repressed coping mechanism, allowing a traumatized individual to "find lifesaving retreat in an altered phenomenal state, in much the way that a hypnotized person is able—not to escape pain—but to disassociate from the experience of pain." George B. Greaves, *Multiple Personality 165 Years After Mary Reynolds*, 168 J. Nervous & Mental Disease 577, 590 (1980).

The heterogeneity of alters (e.g., gender, age, race, sexual orientation, etc.) and their modes of coexisting with the host (e.g., co-conscious, amnestic, amnestic with "leakage") is extremely varied and defies neat categorization. *See* Greaves, *supra*, at 582. However, childlike alters are the most frequently seen type of alters. Frank W. Putman et al, *The Clinical Phenomenology of Multiple Personality Disorder: Review of 100 Recent Cases*, 47 J. Clinical Psychiatry 285, 288 (1986).

## ANALYSIS

■ We determine the admissibility of scientific evi-

dence using a two-part inquiry. *State v. Janes*, 121 Wn.2d 220, 232, 850 P.2d 495, 22 A.L.R.5TH 921 (1993). First, the proposed testimony must meet the standard for admissibility under *Frye v. United States*, 293 F. 1013. *Janes*, 121 Wn.2d at 232. Second, the testimony must be admissible under ER 702. *Janes*, 121 Wn.2d at 232. In this case, the trial court held the proffered testimony did not meet either standard. Our review of admissibility under *Frye* is de novo. *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). Our review of admissibility under ER 702 is for abuse of discretion. *Copeland*, 130 Wn.2d at 255; *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993). We review each in turn.

■ Under the *Frye* standard, novel scientific evidence is admissible if (1) the scientific theory or principle upon which the evidence is based has gained general acceptance in the relevant scientific community of which it is a part; and (2) there are generally accepted methods of applying the theory or principle in a manner capable of producing reliable results. *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994) (citing *Cauthron*, 120 Wn.2d at 888-89). The *Frye* standard recognizes that because judges do not have the expertise to assess the reliability of scientific evidence, the courts must turn to experts in the particular field to help them determine the admissibility of the proffered testimony. *Copeland*, 130 Wn.2d at 255 (citing *Cauthron*, 120 Wn.2d at 887). In applying the test, however, "our purpose is not to second-guess the scientific community." *Janes*, 121 Wn.2d at 232. Rather, the " 'inquiry turns on the level of recognition accorded to the scientific principle involved—we look for *general acceptance* in the appropriate scientific community.' " *Janes*, 121 Wn.2d at 232-33 (quoting *Cauthron*, 120 Wn.2d at 887). " 'If there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted.' " *Copeland*, 130 Wn.2d at 255 (quoting *Cauthron*, 120 Wn.2d at 887).

In reviewing the trial court's conclusion that DID was not generally accepted within the relevant scientific com-

munity, the Court of Appeals faulted the trial court for merging the question of whether there was scientific consensus regarding DID as a psychiatric condition with the question of whether a person suffering from the condition may be considered legally "insane." *Greene*, 92 Wn. App. at 96-97. The Court of Appeals reasoned:

> Under *Frye*, the question is whether DID is a generally accepted mental disorder. In contrast, the relationship between DID and insanity or diminished capacity is a legal issue more appropriately analyzed under ER 702. . . . In addition, concerns regarding potential misdiagnosis or faking of DID should be addressed under ER 702.

*Greene*, 92 Wn. App. at 96 (citation omitted) (citing *Cauthron*, 120 Wn.2d at 890). The Court of Appeals, therefore, found "whether the scientific community has reached consensus regarding the relationship between DID and insanity is not a relevant question for purposes of the *Frye* analysis." *Greene*, 92 Wn. App. at 97. Accordingly, the Court of Appeals limited its analysis to whether DID in principle and practice is generally accepted in the scientific community without reference to related legal determinations. *Greene*, 92 Wn. App. at 97-100. The court found that it was. *Greene*, 92 Wn. App. at 100.

We agree with the Court of Appeals that the relevant inquiry under *Frye* is general acceptance within the scientific community, without reference to its forensic application in any particular case. We also agree with the Court of Appeals that DID is now generally accepted within the relevant scientific community as a recognized mental condition that is regularly diagnosed and treated. As the Court of Appeals noted, the American Psychiatric Association includes DID within its diagnostic manual and outlines the diagnostic criteria for the disorder. *Greene*, 92 Wn. App. at 97-98 (citing DSM-IV at 484-87). "The DSM-IV's diagnostic criteria and classification of mental disorders 'reflect a *consensus* of current formulations of evolving knowledge' in the mental health field." *Greene*, 92 Wn. App. at 98 (quoting DSM-IV at xxvii).

A review of the proffered expert testimony in this case further supports the view that the trial court erred in concluding DID is not generally accepted in the relevant scientific community. Dr. Robert B. Olsen, the defendant's expert, testified unequivocally that DID is generally accepted within the scientific community. Although recognizing there were those who disputed the scientific legitimacy of the disorder, Dr. Olsen testified this is not uncommon. According to Dr. Olsen, the consensus rate in any piece of the American Psychiatric Association's diagnostic manual is only about 85 percent (excluding, perhaps, mental retardation).

The State's expert, Dr. Gregg J. Gagliardi, did not substantially dispute Dr. Olsen's testimony. Although Dr. Gagliardi admitted there remained some controversy regarding the scientific legitimacy of DID, he did not testify that DID, as a diagnosable mental condition, was not generally accepted in the scientific community. Indeed, Dr. Gagliardi cited to two polls of professionals in the field that indicated an acceptance rate of 80 percent, and between 60 to 80 percent, respectively. Dr. Gagliardi himself believes that DID is based on legitimate scientific principles and has diagnosed the condition on several occasions in his capacity as a psychologist at Western State Hospital.

Although we recognize there is some continuing dispute regarding the strength of scientific evidence supporting DID and the accepted methods of diagnosis, the evidence in this case and a review of the available literature convince us that a majority of the relevant scientific community generally accepts DID as a diagnosable mental condition. Certainly, there is little dispute that DID is regularly diagnosed and treated by mental health professionals in this state,[2] as well as throughout the country. Accordingly, we conclude, as did the Court of Appeals, that expert

---

[2]As the facts of this case demonstrate, DID is diagnosed and treated in state-operated facilities by state-certified medical professionals. Greene himself was first diagnosed with the disorder while incarcerated at Twin Rivers and received treatment by state-provided mental health professionals through the state's SOTP, both in prison and thereafter.

testimony regarding DID meets the *Frye* standard for admissibility.

■ Our conclusion that the scientific principles underlying a diagnosis of DID are generally accepted within the scientific community does not necessarily mean, however, that such evidence is admissible in any particular case. Even if generally accepted in principle, proffered scientific evidence is inadmissible under ER 702 unless it is helpful to the trier of fact under the particular facts of the specific case in which the evidence is sought to be admitted. *Cauthron*, 120 Wn.2d at 889-90. In this case, the trial court found the evidence would not be helpful to the trier of fact and refused to admit it. We agree.

Under ER 702, expert testimony will be deemed helpful to the trier of fact only if its relevance can be established. *Riker*, 123 Wn.2d at 364. Scientific evidence that does not help the trier of fact resolve any issue of fact is irrelevant and does not meet the requirements of ER 702. *Reese v. Stroh*, 128 Wn.2d 300, 311, 907 P.2d 282 (1995) (Johnson, J., concurring).

■■ The relevant question to be resolved by the jury in this case was whether, at the time he committed the acts in question, Greene's mental condition prevented him from appreciating the nature, quality, or wrongfulness of his actions, *see State v. Box*, 109 Wn.2d 320, 745 P.2d 23 (1987) (insanity) or, in the alternative, whether the alleged condition demonstrably impaired Greene's ability to form the mental intent necessary to commit the charged crimes. *See State v. Eakins*, 127 Wn.2d 490, 502, 902 P.2d 1236 (1995); *State v. Griffin*, 100 Wn.2d 417, 418-19, 670 P.2d 265 (1983) (diminished capacity).[3] In order to be helpful to the trier of fact, therefore, it is not enough that, based on generally accepted scientific principles, a defendant may be diagnosed

---

[3] ER 702 controls the analysis for both insanity and diminished capacity. The State asks us to revisit our recent decision in *State v. Ellis*, 136 Wn.2d 498, 963 P.2d 843 (1998), in which we held the admissibility of expert testimony regarding diminished capacity is to be determined under ER 702. *Ellis*, 136 Wn.2d at 523. We decline the State's invitation. ER 702 is the standard for admissibility of expert testimony in Washington.

as suffering from a particular mental condition. The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime. *See State v. Wheaton*, 121 Wn.2d 347, 352, 850 P.2d 507 (1993) (expert medical opinion must be adequate to permit legal sanity or insanity of the defendant to be assessed). Scientific principles that are generally accepted but are nevertheless incapable of forensic application under the facts of a particular case are not helpful to the trier of fact because such evidence fails to reasonably relate the defendant's alleged mental condition to the asserted inability to appreciate the nature of his or her actions or to form the required specific intent to commit the charged crime. *See Griffin*, 100 Wn.2d at 418-19; *State v. Ferrick*, 81 Wn.2d 942, 944-45, 506 P.2d 860 (1973). Thus, we agree with the Court of Appeals that in this case a primary consideration under ER 702 is whether and how the symptoms of DID are relevant to the legal concepts of insanity and diminished capacity. *Greene*, 92 Wn. App. at 100.

In *State v. Wheaton* we addressed the virtually identical issue. The specific question there was whether a defendant diagnosed with multiple personality disorder was legally insane at the time of the offense. *Wheaton*, 121 Wn.2d at 348. We assumed that multiple personality disorder was a diagnosable condition under generally accepted scientific principles and, thus, expert testimony regarding such diagnosis met the *Frye* test for admissibility. *Wheaton*, 121 Wn.2d at 351-52 (assuming diagnosis valid and admissible under *Frye*). After an extensive analysis of the record and argument, however, we refused to adopt a specific legal standard by which to assess the sanity of a criminal defendant suffering from multiple personality disorder. *Wheaton*, 121 Wn.2d at 352-65. Our decision was based in large part on the lack of consensus, both in the courts and the medical community, on the proper forensic method to be used. *See Wheaton*, 121 Wn.2d at 352-65. We find ourselves in no better position today than we did then.

In certain respects, the record and testimony in *Wheaton* (which we determined to be inadequate) is superior to that presented here. In *Wheaton*, there was no dispute regarding the psychiatric evaluation of the defendant, and the parties stipulated to the defendant's mental condition at the time of the crime. *Wheaton*, 121 Wn.2d at 349. According to the stipulated facts, there was a "host personality" and one "alter personality." *Id.* At the time of the offense, the alter personality was in executive control of the physical body. *Id.* The parties also agreed the host personality was not conscious or in executive control of the physical body and had no independent knowledge of the acts constituting the offense. *Id.* Furthermore, the defendant's expert testified unequivocally that the host personality met the definition for insanity at the time of the crime. *Wheaton*, 121 Wn.2d at 350. Despite these virtually undisputed facts, we refused to decide the admissibility of expert testimony regarding the defendant's sanity at the time of the crime. Our decision stemmed directly from the fact the scientific community had not yet developed an accepted method to assess the sanity of a criminal defendant diagnosed as suffering from multiple personality disorder. *Wheaton* 121 Wn.2d at 354-65. In other words, the state of the science was incapable of reliable forensic application at that time.

In the present case, the proposed testimony regarding the defendant's mental condition is a great deal more complicated and unclear, as compared to *Wheaton*. The defendant's expert, Dr. Olsen, although apparently prepared to testify to the sanity of the alter (presumably the alter in control at the time of the crime), was unprepared to testify as to the sanity of "Mr. Greene." Dr. Olsen's explanation for this was that he was "not sure who Mr. Green[e] is." 2 Report of Proceedings (RP) at 139. If one talks about the host personality, "[t]he host alter appears to be sane. But I am not in a position to render a judgment of sanity on the entire system." 2 RP at 140.

In contrast, the State's expert, Dr. Gagliardi, testified it

would be impossible, "honestly and professionally," to determine the ultimate legal question of whether a person suffering from DID was insane at the time of the crime. 3 RP at 218. As to the scientific consensus regarding determinations of sanity, Dr. Gagliardi testified that "[o]pinions are all over the map." 3 RP at 214. According to Dr. Gagliardi, the identification of personality states is "riddled with all of the same kinds of philosophical and scientific problems as the concept of personality itself," making it difficult to draw the line between where one personality state ends and another begins. 3 RP at 175. "The practical problem for a forensic evaluator is trying to assess the personality states, alters that would have existed at the time of the crime." 3 RP at 186-87. Moreover, according to Dr. Gagliardi, the possibility of "information leakage," control of one alter by another, and co-conscious personalities, "are the kind of questions that plague forensic evaluation, and were we to have good information about how these personality systems were put together and how this information was distributed in the personality, we might begin to answer those questions, but we are missing that kind of information." 3 RP at 187-88.

In support of Greene's defense, the victim, M.S., was prepared to testify regarding her overall evaluation of the defendant in terms of his personality "system," as well as her perception of the personalities present at the time of the assault. In M.S.' opinion, there were several personalities present at the time of the assault: "Bill," the host personality; "Tyrone," a child alter who appeared to be around the age of three or four; "Sam," another alter; as well as a fourth unidentified alter, possibly "Otto." 7 RP at 486-88. Nevertheless, in support of the defense's theory of the case, M.S. was prepared to testify that the child alter, "Tyrone," was primarily in control at the time of the assault, and there were "substantial amnestic barri-

ers" between Tyrone and the other personalities.[4] 7 RP at 488.

In our view, the helpfulness of the proffered expert testimony can be determined only in relation to a legal standard for culpability in the context of DID. As in *Wheaton*, we are invited by the testifying experts, the parties, and amici to adopt a specific approach to determine whether an individual suffering from DID is legally insane at the time of committing an offense. The various approaches primarily differ on which personality (or personalities) any mental examination should focus. Thus, an approach may focus on the mental condition of the host personality at the time of the offense; or, conversely, on the mental condition of the alter in control at the time of the offense; or, possibly, on the mental condition of each and every alter personality at the time of the crime (under this approach, if any significant alter is not aware of or does not acquiesce in the commission of the crime, such innocent "personlike" entities do not deserve to suffer punishment). According to the testimony and argument in this case, however, none of the various approaches have been accepted as producing results capable of reliably helping to resolve questions regarding sanity and/or mental capacity in a legal sense.

Dr. Olsen's comment that he was "not sure who Mr. Greene is" reflects the fundamental nature and difficulty of the question with which we are presented. That is, when

---

[4]Although we assume Greene is correctly diagnosed as suffering from DID, we note this assertion was likely to be contested at trial. The record contains at least one mental health evaluation that disputes the validity of the diagnosis of the defendant's disorder. The report, prepared by Dr. Daryl B. Mathews, director of residency training, Department of Psychiatry, University of Arkansas, suggests the defendant is feigning symptoms of DID in order to avoid responsibility and, moreover, was able to understand the nature and wrongfulness of his conduct at the time of the offense. Report of Dr. Daryl B. Mathews, Apr. 12, 1995 (App. C, State's *Frye* hearing memorandum). In regards to the original diagnosis that the defendant was suffering from DID, the report references an earlier evaluation by a psychologist at Twin Rivers who opined the defendant "is most likely a narcissistic, antisocial individual who is malingering [multiple personality disorder]. . . . Consequently, the possibility that Mr. Greene is grooming his female therapist for subsequent victimization should not be dismissed lightly." Report of Dr. Mathews, *supra*.

a person suffering from DID is charged with a crime, the question becomes, "who is the proper defendant?" A determination of sanity in this context can be considered only subsequent to the determination of who (which alter personality) should be held responsible for the crime—the host, or possibly one or more of the alters. This, in turn, is related to the scientific possibility of identifying the controlling and/or knowledgeable alters at the time of the crime.

In *Wheaton* we expressly analyzed this identical problem:

> It is not enough to say that [the host personality] was unconscious at the time of the offense. That would matter if the focus should be on the [host] personality . . . . If the focus here should be on the alter in executive control, as the trial court concluded, the question would be whether [the alter] was conscious at the time of the offense. Thus, the fact that [the host] was not conscious does not help resolve the underlying question, i.e., is it proper to focus on the alter personality?

*Wheaton*, 121 Wn.2d at 360.

The difficulty we have with the Court of Appeals' conclusion in this case is that it assumes answers to the above questions. For example, the Court of Appeals reasons the evidence of DID is relevant to a determination of insanity because "Tyrone was the emergent identity, and the host and other alters were not co-conscious with Tyrone." *Greene*, 92 Wn. App. at 103. This assumes the proper focus of any determination of sanity is on the host, or possibly some or all of the other alters. As in *Wheaton*, we are unprepared to make such an assumption at this time.

We recognize that ultimately the question of who should be held responsible for the commission of a crime is a legal one. *Wheaton*, 121 Wn.2d at 353-54. In the present context, however, the answer largely depends on the ability of the scientific community to assist the courts in understanding how DID affects individuals suffering from it and how this may be related to a determination of legal culpability. *Wheaton*, 121 Wn.2d 353-54. We do not exclude the pos-

sibility that there may be a case in which the sanity of a defendant suffering from DID can be reliably evaluated. However, based upon the evidence and testimony presented here, we do not find this is such a case. Accordingly, we must agree with the trial court that the proposed expert testimony in this case was inadmissible under ER 702 because it would not have been helpful to the trier of fact.

## CONCLUSION

To summarize, we hold DID is generally accepted in the psychiatric and psychological communities; in this case, DID testimony was properly excluded because it was not possible to reliably connect the symptoms of DID to the sanity or mental capacity of the defendant.[5]

Affirmed in part and reversed in part.

SMITH, MADSEN, TALMADGE, SANDERS, and IRELAND, JJ., and HOUGHTON, J. PRO TEM., concur.

ALEXANDER, J. (concurring) — I agree with the majority's ultimate conclusion that the testimony concerning Greene's alleged dissociative identity disorder (DID) was properly excluded by the trial court. I part company with the majority only insofar as it states "that DID is now generally accepted within the relevant scientific community as a recognized mental condition that is regularly diagnosed and treated." Majority op. at 71.

As the majority observes, it is beyond dispute that if "there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted." *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993). In my view, the State's submissions establish that

---

[5]Greene presents no new argument for finding the Persistent Offender Accountability Act unconstitutional. Therefore, we decline his invitation to overturn our previous determination that the POAA is constitutional. He also argues that denying him the right to present evidence of DID to the jury denies him the right to present a defense. Since we decide this case on more narrow grounds, we do not reach this issue.

DID has not yet become "generally accepted" within the psychiatric and psychological communities. The submissions suggest, rather, that there is a significant dispute between experts as to the validity of DID. For example, the State points to a recent survey of board-certified psychiatrists which indicates that there is, in fact, a substantial dispute surrounding the validity of DID diagnoses. This survey concluded that "[a]mong board-certified American psychiatrists, there currently appears to be *little consensus* regarding the diagnostic status or scientific validity of . . . dissociative identity disorder [DID]." Harrison G. Pope, Jr. et al., *Attitudes Toward DSM-IV Dissociative Disorders Diagnoses Among Board-Certified American Psychiatrists*, 156 AM. J. PSYCHIATRY 321, 321 (1999) (emphasis added). Furthermore, this survey discloses that "only about one-third of [the 301 psychiatrists who responded to the survey] replied that . . . [DID] should be included without reservations in DSM-IV." Pope et al., *supra*, at 321. Hardly a ringing endorsement. The State also cited other sources which demonstrate that the psychiatric and psychological communities have yet to "generally accept" diagnoses of DID. Pet. for Review at 8-10; Br. of Resp't at app. B; Supplemental Br. of Pet'r at 1-4. Finally, I note that even in the additional authority submitted by Greene there is an acknowledgement that "marked skepticism among professionals as to the legitimacy of the multiple personality diagnosis [i.e., DID] has been reported." Gary E. Dunn et al., *Belief in the Existence of Multiple Personality Disorder Among Psychologists and Psychiatrists*, 50 J. CLINICAL PSYCHOL. 454, 454 (1994); *see also* Resp't's Statement of Additional Authorities.

In short, the State has established that there exists a significant dispute in the psychiatric and psychological communities regarding the validity of DID diagnoses. While I do not contend that DID will never gain general acceptance within the relevant scientific communities, I believe that validity of DID diagnoses remains an open question. In my view, the majority opinion reaches too far when it concludes

that DID has gained general acceptance within the psychiatric and psychological communities so that testimony regarding DID will be admissible provided it satisfies the requirements of ER 702.

For these reasons I concur only in the result reached by the majority.

GUY, C.J., concurs with ALEXANDER, J.

Reconsideration denied November 24, 1999.

[No. 09213-3.  En Banc.]
Argued June 24, 1999.    Decided October 7, 1999.
*In the Matter of the Disciplinary Proceeding Against* ARTHUR H. BOELTER, *an Attorney at Law.*