28 P.3d 1 (2001)
107 Wash.App. 289
Sandra RUFF, Appellant,
v.
DEPARTMENT OF LABOR AND INDUSTRIES OF the STATE OF WASHINGTON, Respondent.
No. 45095-6-I.
Court of Appeals of Washington, Division 1.
May 21, 2001.
Publication Ordered July 17, 2001.
*2 Carol L. Casey, Casey & Casey, P.S., Port Orchard, for Appellant.
Anastasia R. Sandstrom, Asst. Attorney General, Seattle, for Respondent.
COX, J.
Two physicians diagnosed Sandra Ruff with porphyria, a rare, mostly hereditary disorder of blood enzymes. They testified before the Board of Industrial Insurance Appeals that the condition was caused by her workplace exposure to chemicals during a building remodel. On appeal to the superior court of the Board's adverse decision on the worker compensation claim, the trial court excluded evidence of the causal relationship between the diagnosis of Ruff's porphyria and her workplace chemical exposure based on Frye.[1] Because the testimony of the two doctors and the methodology of the blood test used to diagnose Ruff's alleged porphyria and the theory that porphyria is caused by short-term exposure to chemicals in the ambient air are not generally accepted in the relevant scientific community, we affirm.
In September 1992, Sandra Ruff was working at a Highline Community College building that was being remodeled. The remodeling included painting and carpeting. During the first few days of remodeling, Ruff experienced headaches, watery and burning eyes, nausea, and difficulty sleeping. On the fourth day, after smelling a strong chemical odor, Ruff felt as if she was going to "pass out" and was taken to the hospital emergency room. Upon arrival at the ER, Ruff immediately felt better. Ruff's blood tests were normal, and the ER doctor diagnosed Ruff's symptoms as an acute allergic reaction. Two days later, Ruff returned to work. But after two hours, she felt dizzy and weak. She also experienced numbness in her face and shortness of breath and left work early.
Prior to her workplace exposure to fumes, Ruff had a history of head injuries, headaches, depression, and anxiety. She saw a number of doctors for symptoms that included fatigue, sore throat, nausea, nasal congestion, cough, and vomiting. The doctors performed numerous blood, liver, and urine tests, as well as an Epstein-Barr virus test. Ruff's test results were all normal.
Ruff saw her physician, internist Dr. Bliss, regarding the cough, weakness, dizziness, and nausea she experienced shortly after her workplace exposure. Dr. Bliss performed a physical exam, which was normal. He opined that Ruff had a panic reaction.
During the next four months, Ruff saw several doctors, including an allergy specialist, *3 an ER physician, and a neurologist. The doctors examined Ruff, and she underwent pulmonary function tests, blood tests, urinalysis, EKG, and a MRI. The results of these tests were all normal, and the various doctors diagnosed her with panic disorder and depression.
In May 1993, Ruff saw Dr. David Buscher, who limits his practice to patients with allergies and chemical sensitivity. Based on Ruff's account of her medical history and an allergy test, Dr. Buscher diagnosed Ruff with multiple chemical sensitivity. Dr. Buscher also ordered a MRI for Ruff, which the neurologists interpreted as normal. Dr. Buscher later tested for porphyria[2] by sending Ruff's urine, stool, and blood samples to the Mayo Laboratory.
Ruff's stool test was normal and only one of the four enzymes tested for in Ruff's blood showed marginally abnormal levels. Ruff's urine test revealed only slight elevation of two enzymescoproporphyrin and porphobilinogenthat would normally be increased dramatically in the urine of porphyria patients. Based on these tests, Dr. Buscher concluded that Ruff suffered from "toxic effects of chemicals resulting in a disorder of porphyria metabolism and multiple chemical sensitivities."[3]
Ruff also saw Patricia Sparks, M.D., MPH, an occupational medical specialist in chemical exposure and epidemiology. Dr. Sparks was the acting director for the Occupational Safety and Health Administration and was on the clinical faculty at Harvard Medical School and Harvard School of Public Health. Dr. Sparks works as a medical consultant for the State's Department of Labor and Industries (DLI). Dr. Sparks reviewed Ruff's extensive medical record and also examined Ruff. Dr. Sparks concluded that Ruff's symptoms were not typical for porphyria and that she did not meet even minimum clinical or laboratory thresholds for a porphyria diagnosis. Instead, she diagnosed Ruff with multiple chemical sensitivity, upper respiratory tract irritation from low levels of volatile organic compounds, panic disorder, and depression. Dr. Sparks did not believe these conditions were related to Ruff's workplace exposure.
Ruff then saw Dr. William Morton in April 1994. Dr. Morton is a professor of environmental medicine and epidemiology at Oregon Health Sciences University. He is Board certified in preventative medicine and occupational medicine and first became interested in "chemically activated porphyria" in 1992.[4] Dr. Morton has not published any papers relating to porphyria. He listened to Ruff's account of her medical history, tested her mental functions, and physically examined Ruff. The result of the mental function test was normal and the physical exam revealed pimples on Ruff's arm, lower abdomen tenderness, and diminished sensation in her feet and one cheek.
Dr. Morton also ordered red cell enzyme and stool tests from the Mayo Laboratory. The stool tests showed normal porphyrin excretion. The levels of three of the four red cell enzymes tested normal. One of the enzymes, coproporphyrinogen oxidize, was marginally below normal, but Dr. Morton did not repeat the test as the Mayo Laboratory recommends. Dr. Morton also reviewed the result of a urine test ordered by Dr. Buscher earlier. As a result of these tests, Dr. Morton diagnosed Ruff with "chronic porphyria [] activated by chemical exposure."[5]
Ruff applied for worker's compensation benefits based on her workplace exposure. *4 In a February 1994 order, DLI accepted her claim as a toxic reaction to gas and vapors and agreed to pay bills associated with that claim prior to June 21, 1993. But it denied responsibility for Ruff's depression, chronic fatigue syndrome, and somatization disorder, and closed Ruff's claim. Ruff appealed the order to the Board of Industrial Insurance Appeals (Board). At the proceedings before an Industrial Appeals Judge, Ruff offered the testimony of Dr. Morton and Dr. Buscher that her alleged porphyria was caused by her workplace exposure to chemicals. The judge issued a proposed decision and order rejecting the testimony and affirming DLI's order. On appeal, the Board affirmed DLI's order.
Ruff appealed the Board's decision to the superior court. Based on Frye, DLI moved to exclude Dr. Morton and Dr. Buscher's testimony regarding the Mayo Laboratory red cell enzyme test and the claimed causal relationship between Ruff's workplace exposure and her alleged porphyria. The trial court granted DLI's motion to exclude. Thereafter, Ruff moved to dismiss her appeal based on the exclusion of the above evidence and the lack of other evidence to establish a prima facie case.
Ruff appeals the orders excluding testimony and dismissing her case.

Preservation
Ruff first argues that DLI failed to preserve before the Board its objection to the admissibility of Dr. Morton and Dr. Buscher's testimony regarding (1) the use of the Mayo Laboratory red cell enzyme tests to establish the existence of Ruff's alleged porphyria, and (2) the cause of Ruff's alleged porphyria. We disagree.
The trial court, when conducting a de novo trial of an appeal from the Board of Industrial Insurance Appeals, acts in an appellate capacity and is entitled to independently resolve questions relating to the admission of evidence.[6] However, it may only consider evidentiary issues that are objected to at the hearing below on the same grounds and preserved in the record.[7] This requirement ensures that a party offering evidence has an opportunity to cure any defects and that an appellate tribunal has a record that permits resolution of all issues.[8]
A review of the record before us shows that DLI objected at the proceedings before the Board to Dr. Morton's testimony regarding the existence and cause of Ruff's alleged porphyria:
[Ruff's counsel:] Based on your training and your experience, the opportunities you've had to see [Ruff], reviewing records, do you have an opinion as to what if any effect causatively the exposure [Ruff] had at work ... around September 11, 1992, had upon the condition you've diagnosed...?
[DLI counsel:] Objection.

...
[Dr. Morton:] The opinion is that [Ruff's] workplace exposure to the fumes and dust and chemicals directly was the major contributing cause of her symptoms and that the porphyria and the porphyrin enzyme susceptibility provides a credible mechanism to explain the symptoms and the fact of her susceptibility.

[DLI counsel:] I am going to interpose an objection to that and move to strike the Doctor's opinion for lack of foundation.

...
[DLI counsel:] I am going to interpose an objection by questioning Dr. Morton.
[DLI counsel:] Doctor, your opinion that the workplace exposure to paint fumes, dust, that you'd likely find in the context of remodeling is the major cause of Ms. Ruff's ongoing symptoms. Is that explicable by the symptoms of porphyria? Is the basis of that, other than anythingother *5 than experiences you've had with your own patients?

[Dr. Morton:] Well, there are innumerable cases published in which chemical exposure of one kind or another, particularly paints and solvents and metals, have led to the initiation or aggravation of symptoms.

...
[DLI counsel:] Let me see if I could narrow it down a little bit. My specific question was, are you relying on a particular study, and by study I mean printed in a peer review medical journal, the subject of studies involving a control group which is the basis of your opinion that in Ms. Ruff's particular case[,] the exposure that she suffered in her workplace to the particular chemical that she was exposed to contained in the remodeling process have been proven on a more probable than not medical basis by survey of the study to cause or aggravate the porphyria?

...
[Dr. Morton:] My answer would be that I know of no case study of remodeling fumes or dust in relation to porphyria aggravation.
[DLI counsel:] Would you agree that without that type of data, others in the field of porphyria would be reluctant to rely upon your opinion?

[Ruff's counsel:] Excuse me, that's not voir dire, and I think we'll proceed with direct. Counsel, you can do cross-examination later, okay?
[DLI counsel:] I think that I am entitled to make the record to support the foundation [for] my objection ... I think that one of the rules of evidence in [this] case, supposing it is suggested that the data that is replied [sic] upon by an expert in giving [an] opinion in order to be admissible must be shown to be the type relied upon by others in the field.[[9]]
Moreover, at the hearing before the industrial appeals judge, DLI renewed its objection to Dr. Morton's deposition testimony excerpted above as well as his testimony on cross-examination that exposure to paints, solvents, glue, and diesel fumes causes porphyria:
[DLI counsel:] Judge Stewart, I'm aware of your earlier ruling on the foundation objections made in the direct examination portion of Dr. Morton's deposition. For the record, however, I would like to renew that objection and that's based on the grounds of Evidence Rule 703 as well as on the [S]tate [S]upreme court case of Reese versus Stroh and some recent Board decisions, including one [where] the claimant's name is Bergman. I don't have the docket number but I could supplement the record with that, and Dr. Morton's answers on cross-examination regarding the status of his theory and that it has not been published or subject to peer review.

[Judge:] All right.[[10]]
DLI also objected to Dr. Buscher's deposition testimony regarding the existence and cause of Ruff's alleged porphyria:
[Ruff's counsel:] Based on your training and experience, the information you received and relied upon, your observations of [Ruff], do you have an opinion as to whether the condition that you've seen and treated her for bears any causal relationship to that [workplace] exposure [to chemicals]?
[Dr. Buscher:] Yes.
[DLI counsel:] I am going to insert an objection to that question and the answer on the grounds of foundation with respect to porphyria.
[Ruff's counsel:] Why?
[DLI counsel:] On the grounds that there is no[t]hat there is no scientific data to support the theory that low levels of various unidentified chemicals cause or aggravate porphyria in humans.

And the basis of the objection is Evidence Rule 703, the Supreme Court case of Reese v. Stroh, [and] the U.S. Supreme Court [case] of ... Dow v. Dalbert[sic]. And a *6 number of Board cases one of which is In re: Lori Anderson which has kept ... nonmedical theories that aren't widely accepted... out of the evidence on causation theory.

...
[Dr. Buscher:] My opinion is that Sandy Ruff's exposures at work would have caused her to be ill with the present symptom complex.

...
[Ruff's counsel:] ... Other than the conditions you have diagnosed, would you have any other diagnostic entities that would explain what's gone on with [Ruff] other than what you have expressed?
[Dr. Buscher:] There is no other cause I can think of.

...
[Ruff's counsel:] Is there a particular type of porphyria that's recognized to be associated with exposure to toxic substances?
[Dr. Buscher:] It's called [ ] toxic porphyria.
[Ruff's counsel:] Is that what [Ruff] has?
[Dr. Buscher:] Yes.[[11]]
As the above excerpts illustrate, DLI properly objected to the theory of porphyria being caused by exposure to chemicals on grounds that it was a novel theory not accepted by the majority of the medical community. The objection to the testimony regarding the cause and diagnosis of Ruff's symptoms as porphyria together encompassed objections to the methodology of the Mayo Laboratory tests used by the doctors in making that diagnosis as not meeting the Frye standard.[12] Thus, the issues of whether Dr. Buscher's and Dr. Morton's causal theory and the Mayo Laboratory test methodology employed to establish that theory meet the Frye standard for admissibility were preserved for review before the trial court.
Ruff's argument that DLI's objections were only limited to testimony about the causal relationship between porphyria and low level exposure to chemicals is unpersuasive. As the excerpts above show, the objections were not limited to challenging the theory that "low levels" of unidentified chemicals cause porphyria. Rather, the objections are properly read to challenge exposure to chemicals present during a building remodel, which was what Ruff experienced here.

Evidentiary Ruling
Ruff next contends that the trial court erred in striking testimony regarding the Mayo Laboratory test and the causal relationship between Ruff's workplace exposure to chemicals and her alleged porphyria on grounds that it did not meet Frye standards for admissibility. We disagree.
To be admissible, expert testimony concerning novel scientific evidence must both satisfy both Frye and ER 702.[13] Under Frye, evidence derived from a scientific theory is admissible only if the theory has achieved general acceptance in the relevant scientific community.[14] Washington courts have applied the Frye rule to both criminal and civil cases.[15] The Frye rule is concerned only with whether the expert's underlying theories and methods are generally accepted. The resultthe conclusion reached by the expert in the case at handis by definition fact-specific and need not be generally accepted in the scientific community.[16] Thus, a *7 Frye analysis need not be undertaken with respect to evidence that does not involve new methods of proof or new scientific principles from which conclusions are drawn.[17]
We review the admissibility of evidence under the Frye test de novo.[18] Our de novo review of admissibility of scientific theory or methodology under Frye need not be confined to the record and may involve consideration of the available scientific literature, secondary legal authority, and cases in other jurisdictions.[19] Moreover, materials that are not available until after a Frye hearing may be considered.[20]
Relying on Reese v. Stroh,[21] Ruff's counsel argued at oral argument that Frye does not apply to Dr. Morton and Dr. Buscher's opinion that workplace exposure to chemicals caused Ruff's alleged porphyria because they did not rely on any novel scientific methodology or principle for their opinion.[22] In Reese, a medical malpractice case, the doctor sought to exclude under Frye the patient's expert's testimony that the doctor's failure to treat patient with Prolastin therapy caused the patient's decreased lung capacity.[23] Our Supreme Court held that Frye was inapplicable because the doctor did not argue that the theory or methodology involved in Prolastin therapy lacked acceptance in the scientific community.[24] Rather, the court noted that the doctor's objection was directed toward the expert's causation opinion on the basis that there have been no statistically significant studies proving the efficacy of Prolastin therapy in treating AAT deficiency.[25] And as an "expert opinion regarding the application of an accepted theory or methodology to a particular medical condition," it did not implicate Frye.[26]
This case is distinguishable from Reese. Unlike the doctor there, DLI clearly argued that the theory of "chronic porphyria" caused by odor-level chemicals present during building remodel lacked general acceptance in the medical community. As such, Dr. Morton's and Dr. Buscher's causation opinion squarely implicates Frye.
We next determine whether the causation opinion and the methodology of the Mayo Laboratory tests are generally accepted in the relevant scientific community to satisfy Frye. A de novo review leads us to the conclusion that the methodology of the Mayo Laboratory blood enzyme tests has not achieved general acceptance among porphyria experts. DLI's expert, Dr. Brent Burton, M.D., questioned the validity of the Mayo test. Dr. Burton is Board certified in medical *8 toxicology and environmental health and he is the medical director of Occupational Medicine at Oregon Health Sciences University. He stated that the methodology of the Mayo tests was not a scientifically valid way to test for porphyria because it lacked control groups and has not been published or peer reviewed. Moreover, Dr. Sparks stated that the test results were affected by the way the blood samples are handled and that the standard or normal reference ranges for the various enzymes tested have not been established or published by the Mayo Laboratory.
Dr. Morton and Dr. Buscher's causation theory also has not achieved general acceptance among porphyria experts necessary for admission. Dr. Morton and Dr. Buscher admitted that they were a distinct minority with respect to their theory that exposure to ambient chemicals in the workplace during a building remodel causes porphyria and that the relevant medical community does not accept their theory. And Dr. Buscher stated in his deposition testimony that there are no journal articles substantiating his theory that exposure to unquantified amounts of chemicals in the ambient air causes porphyria.
Moreover, Dr. Morton conceded that his diagnosis of "chronic porphyria" to include patients with mild symptoms of porphyria such as Ruff was a minority view among porphyria experts. He acknowledged that most other porphyria experts diagnose porphyria only if highly abnormal amounts of porphyrin are present in urine or stool and blood, combined with severe skin blisters and constant neurological and cognitive problems. He also stated that his diagnosis of "chronic porphyria" is virtually synonymous with multiple chemical sensitivity syndrome but he prefers the diagnosis of porphyria because it has objective documentation tests that is required for workers' compensation claims.
DLI presented the deposition testimony of Dr. Sparks. She stated that the medical literature does not support the theory that exposure to chemicals in the ambient air causes porphyria. She acknowledged that there have been a few cases where porphyria symptoms were precipitated by an environmental chemical exposure. But she explained that those exposures were to identified toxic chemicals such as hexachlorobenze at massive levels through ingestion so that one could not extrapolate that situation to exposure to unidentified chemical fumes during a building remodel.
DLI also submitted the deposition testimony of Dr. Burton. Dr. Burton stated that the theory that exposure to chemicals in the air causes porphyria has not been tested in control group studies, supported by adequate documentation, or accepted by the medical community. He also stated that the concentration of chemicals that occurs at an odor-level exposure in a building remodel is not sufficient to impair the heme biosynthesis process so as to cause porphyria.
Finally, peer reviewed medical literature dismisses the theory that short-term ambient exposure to chemicals causes porphyria:
Unfortunately, there have been efforts recently to define porphyria as a generalized sensitivity to chemicals, including not only medications, but also perfumes, newsprint, environmental pollutants, volatile agents in the workplace, and even metals. Porphyria has thus become a particular focus of advocates of "multiple chemical sensitivity syndrome" (MCS) or "chronic fatigue syndrome," the speculation being that individuals with such problems are unrecognized latent porphyrics. That hypothesis is inconsistent with data on drug sensitivity in porphyria ... and it ignores the fact that spontaneous attacks of porphyria have not been linked to metals or to low levels of ambient volatile agents. Finally, the postulated link between hereditary acute porphyria and MCS is not supported by laboratory evaluation, when correctly applied...
This is not to say that exposure to toxic chemicals cannot interfere with porphyrin biosynthesis, cause porphyrinuria, and even lead to symptoms resembling porphyria. Lead poisoning is one well-known example. Another is the infamous accident in Turkey 40 years ago when ingestion of [the fungicide] hexachlorobenzene produced a "toxic porphyria" resembling [porphyria cutanea tarda] in several thousand individuals.... In only some of these [cases], however, did affected individuals exhibit increased urine porphyrins, which *9 were quantitatively minor ... Thus, the impact of environmental chemicals on heme biosynthesis and porphyrin excretion in otherwise healthy humans seems to be less than expected[.][[27]]
The relevant medical literature also concludes that such a theory is speculative and unestablished at best:
[C]ertain exogenous chemical exposures can actually cause porphyria in the absence of genetic predisposition.... Other chemicals have also been linked to cases of porphyria in humans; the reported cases, however, have been infrequent ... [and] have generally been linked to chronic industrial exposures, industrial accidents, or environmental exposures that were much higher than normally encountered. Chemical exposures have not been established as a cause (i.e., not just a trigger in the presence of genetic predisposition) of porphyrias with primarily neurologic manifestations, although lead intoxication is noteworthy as a possible exception.

...
A variety of chemical associated illnesses with unknown causative mechanisms, notably MCS syndrome, have been reported in association with abnormal results of porphyria-related tests. It is hypothesized that these test values reflect pathophysiologic disturbances of heme synthesis that are directly involved in the manifestation of those illnesses..... However, the very low levels of exposure to which MCS patients are ... sensitive are much lower than the ... chemical exposures reported to date in association with [porphyria cutanae tarda] or subclinical porphyrinurias in humans, where situations generally have involved chronic industrial exposures, industrial accidents, or environmental exposures that were much higher than normally encountered, and with the exception of lead intoxication, have not been reported to involve low-level environmental exposures.

...

Given the current paucity of evidence in favor of disturbances of heme synthesis being operative in MCS syndrome and other unexplained chemical-associated illnesses, and unless supportive evidence can be provided by well designed and controlled studies, the proposed relationship with disturbances of heme synthesis should, at most, be considered speculative and unestablished.[[28]]
In sum, there is great skepticism among qualified experts that the Mayo Laboratory test is a valid diagnostic tool for porphyria and that exposure to ambient chemicals during a building remodel causes "chronic porphyria" of the type allegedly experienced by Ruff. As such, the testimony of Dr. Morton and Dr. Buscher concerning the Mayo tests and causation theory does not satisfy the Frye test, and the trial court properly struck the testimony.[29]
Intalco Aluminum v. Dept. of Labor & Indus.[30] does not mandate a contrary result as it is distinguishable from this case. The claimants in Intalco worked 12 years at an aluminum pot room. A federal air pollution survey of the pot room established the presence of known neurotoxins such as aluminum particulates and carbon monoxide and petroleum pitch volatiles.[31] The claimants' doctors diagnosed them with a disorder of the central nervous system and concluded that a toxin or a combination of toxins in the pot room more probably than not caused the disease.[32]
*10 The Intalco court rejected the employer's claim that there was insufficient evidence to support the jury's finding of proximate cause between the claimants' disease and their workplace exposure because no physician could identify the specific toxic agent or agents in the pot room that proximately caused the claimants' disease. The court declined to require proof of the precise chemical that caused the claimants' disease because several neurotoxins were identified in the pot room, it was undisputed that the neurotoxins cause symptoms similar to that exhibited by the claimants, and their symptoms did not fit the diagnostic criteria of any known disease.[33] In contrast, no one knows what chemicals Ruff was exposed to during the week-long building remodel. And as stated above, medical experts and literature reject the theory that exposure to chemicals in the air causes porphyria. Finally, the vast majority of the doctors who examined Ruff diagnosed her with panic disorder, upper respiratory tract irritation, and depression.
We need not address Ruff's challenge to the trial court's order dismissing her appeal because she provides no legal argument to support the challenge.[34]
We affirm the orders.
WEBSTER and ELLINGTON, JJ., concur.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[2] Porphyrias are rare, mostly hereditary disorders in the biosynthesis of heme, the organic compound that provides the foundation structure for hemoglobin found in blood. Porphyria is expressed by large amounts of porphyrins that accumulate in the blood, and are excreted in the urine or stool. There are different types of porphyria marked by different symptoms. The symptoms of porphyrias with neurologic manifestations include permanent numbness and tingling; encephalopathy manifested by severe disordered thinking, confusion, or psychosis; and severe abdominal pain and constipation. The symptoms of porphyrias with cutaneous manifestations include severe photosensitivity, large blistering skin lesions, and scarring.
[3] Deposition of David Buscher, M.D. on September 19, 1996 at 16.
[4] Deposition of William E. Morton, M.D. on July 1, 1996 at 5-6, 8.
[5] Deposition of William E. Morton, M.D. on July 1, 1996 at 38.
[6] Sepich v. Dept. of Labor & Industries, 75 Wash.2d 312, 316, 450 P.2d 940 (1969).
[7] Sepich, 75 Wash.2d at 316, 450 P.2d 940; Johnson v. Weyerhaeuser Co., 134 Wash.2d 795, 800, 953 P.2d 800 (1998).
[8] Sepich, 75 Wash.2d at 317, 450 P.2d 940.
[9] Deposition of William M. Morton, M.D. on July 1, 1996 at 29-33 (italics ours).
[10] Hearing on September 24, 1996 at 44-45 (italics ours).
[11] Deposition upon oral examination of David Buscher, M.D. on September 19, 1996 at 18-20 (italics ours).
[12] This is made evident by the fact that DLI elicited deposition testimony from its own experts, Dr. Sparks and Dr. Burton, that the methodology of the Mayo Laboratory tests have not been published or peer reviewed.
[13] State v. Copeland, 130 Wash.2d 244, 256, 922 P.2d 1304 (1996).
[14] Copeland, 130 Wash.2d at 255, 922 P.2d 1304.
[15] 5B Karl B. Tegland, Washington Practice Evidence Law and Practice, § 702.19, p. 70-71 (1999 & Supp.2000).
[16] 5B Karl B. Tegland, Washington Practice Evidence Law and Practice, § 702.18, p. 67 (1999 & Supp.2000).
[17] State v. Russell, 125 Wash.2d 24, 69, 882 P.2d 747 (1994), cert. denied, Russell v. Washington, 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995); Reese v. Stroh, 128 Wash.2d 300, 307, 907 P.2d 282 (1995) (Frye inapplicable to medical expert testimony that use of Prolastin would be effective in treating AAT (a blood-borne protein) deficient patients where FDA approved use of Prolastin in treating AAT-deficient patients and defendant did not argue that theory or methodology involved in Prolastin therapy lacks acceptance in the scientific community); Bruns v. PACCAR, Inc., 77 Wash.App. 201, 215-16, 890 P.2d 469, review denied, 126 Wash.2d 1025, 896 P.2d 64 (1995) (Frye inapplicable to expert testimony that low levels of chemicals found in the cab of new trucks could produce low level sensory irritation experienced by drivers because experts relied on established scientific methods of air sampling, chemical analysis, clinical examinations, and questionnaires).
[18] State v. Greene, 139 Wash.2d 64, 70, 984 P.2d 1024 (1999), cert. denied, Greene v. Washington, 529 U.S. 1090, 120 S.Ct. 1726, 146 L.Ed.2d 647 (2000); Copeland, 130 Wash.2d at 261, 922 P.2d 1304.
[19] Copeland, 130 Wash.2d at 255-56, 922 P.2d 1304; State v. Greene, 92 Wash.App. 80, 95, 960 P.2d 980 (1998), rev'd in part on other grounds, 139 Wash.2d 64, 984 P.2d 1024 (1999).
[20] Copeland, 130 Wash.2d at 256, 922 P.2d 1304.
[21] 128 Wash.2d 300, 907 P.2d 282 (1995). Prolastin therapy consists of administering a preparation of purified human AAT, a blood-borne protein which inhibits the destructive action of certain enzymes in the lung, to patients diagnosed with AAT deficiency.
[22] Counsel for Ruff conceded at oral argument that the Mayo Laboratory enzyme tests must meet the Frye standard for admissibility.
[23] Reese, 128 Wash.2d at 303-04, 907 P.2d 282.
[24] Reese, 128 Wash.2d at 307, 907 P.2d 282.
[25] Reese, 128 Wash.2d at 307, 907 P.2d 282.
[26] Reese, 128 Wash.2d at 307, 907 P.2d 282 (italics ours).
[27] Antony F. McDonagh and D. Montgomery Bissell, Porphyria and PorphyrinologyThe Past Fifteen Years, Vol. 18, no. 1, Seminars in Liver Disease, 3, 6-7 (1998) (italics ours).
[28] William E. Daniell, et al., Environmental Chemical Exposures and Disturbances of Heme Synthesis, 105 Environmental Health Perspectives, Supp. 1, at 37, 48, 49 (February 1997) (italics ours).
[29] Copeland, 130 Wash.2d at 255, 922 P.2d 1304 (scientific evidence not admissible under Frye if there is a significant dispute among qualified experts as to its validity).
[30] 66 Wash.App. 644, 833 P.2d 390 (1992), review denied, 120 Wash.2d 1031, 847 P.2d 481 (1993).
[31] Intalco, 66 Wash.App. at 648-49, 833 P.2d 390.
[32] Intalco, 66 Wash.App. at 655, 833 P.2d 390.
[33] Intalco, 66 Wash.App. at 656, 833 P.2d 390.
[34] Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).